Edwin K. ATWOOD et al., Appellants,

v.

WILLACY COUNTY NAVIGATION DISTRICT, Appellee.

No. 12660.

Court of Civil Appeals of Texas.

San Antonio.

May 19, 1954.

Rehearing Denied June 23, 1954.

Bowie & Scanlon, San Benito, Robinson & Strawn, Raymondville, Parker & Smith, San Antonio, Nielsen & McCormick, Raymondville, for appellee.

NORVELL, Justice.

Edwin K. Atwood, Alice B. Atwood and Thomas Hart Fisher have appealed from a judgment of the District Court of Willacy County condemning the fee simple title to the surface (exclusive of minerals and all mineral rights) in and to a tract of land containing .1,760 acres, specifically described by metes and bounds in the judgment.

Condemnation of such land was sought by Willacy County Navigation District for the purpose of constructing a port and attendant facilities to be used in connection with the development and operation of navigable waters of the State. The proposed port, known as Port Mansfield, is to be located on Red Fish Bay in Willacy County.

The appellants submit the appeal upon twenty-three points of error. The record is lengthy, consisting of a 350-page transcript and 1,630 pages of statement of facts. We cannot discuss in detail all the contentions raised and arguments advanced in the briefs and keep this opinion within due bounds. Perhaps the most important contention presented is that certain portions of House Bill 451, Acts of the Fiftieth Legislature, Regular Session, 1947, ch. 125, p. 218, Article 8263h, Vernon's Ann.Tex. Stats., are unconstitutional.

Appellee district was organized in accordance with the provisions of Article 16, § 59, of the Vernon's Ann.St. Constitution of the State of Texas and an act of the Legislature adopted in 1925, and as amended in 1945 and 1947, Acts 1925, 39th Leg. p. 7, ch. 5; Acts 1945, 49th Leg. p. 180, ch. 139; Acts 1947, 50th Leg. p. 218, ch. 125; Article 8263h, Vernon's Ann.Tex.Stats. A further amendment was adopted in 1949, Acts 51st Leg., p. 1188, ch. 601, but the provisions thereof are not here material.

Cox, Wagner, Adams & Wilson, Brownsville, S. L. Gill, Raymondville, for appellants.

On April 5, 1948, the Canal and Navigation Commissioners of the district by proper order found that for the purposes therein set forth it was "necessary and/or required that it acquire fee simple title to the surface and an easement on the mineral rights over, on, in and under" the 1,760-acre tract of land owned by appellants. The stated purposes for which the land was to be acquired were in substantial compliance with the provisions of the 1947 amendment to the statute, Article 8263h, § 50, Vernon's Ann.Tex.Stats.

The 1947 amendment provides that:

"All navigation districts organized under Article XVI, Section 59, of the Constitution of Texas, whether created by Act of the Legislature or organized under General Law, shall have the right, power and authority to acquire by gift, purchase or condemnation proceedings and to own lands adjacent or accessible to the navigable waters and ports developed by them, that may be necessary or required for any and all purposes incident to or necessary for the development and operation of said navigable waters or ports within said districts or that may be necessary or required for or in aid of the development of industries on said lands, and may lease same or any part thereof to any individual or corporation and charge therefor reasonable tolls, rents, fees or other charges, and use such proceeds both for the maintenance and operation of the business of such districts and for the purpose of making themselves self-supporting and financially solvent and returning the construction costs of their improvements within a reasonable period. The acquisition of said lands for said purposes and the operation and industrial development of such ports and waterways are hereby declared to be a public purpose and a matter of public necessity."

It is appellants' contention that part of the statutory provision above quoted is unconstitutional in that it permits the taking of private property for a use which is not public. It is urged "that the Legislature cannot constitutionally authorize the taking of private property for the development of industry, because such is not a public use, but a private use."

█ Article 1, § 17, of the Texas constitution, Vernon's Ann.St., prohibits the taking of private property for other than a public use. The constitutional provision states that, "No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made * * *," and, as pointed out in 2 Nichols, "Eminent Domain" § 7.1(2), "It is now well settled in every state in the union that the prohibition against the taking of property for the public use without just compensation impliedly, but none the less definitely forbids a taking of property for private uses, and it is too late to raise scholastic objections to the established interpretation of this clause of the constitution." There are decisions holding that the taking of property for other than public use likewise violates the due process clauses of the state and federal constitutions. City of Cincinnati v. Vester, 6 Cir., 33 F.2d 242, 68 A.L.R. 831, affirmed, 281 U.S. 439, 50 S.Ct. 360, 74 L.Ed. 950; 2 Nichols, Eminent Domain, § 7.1(3).

█ The term "public use" is employed in the constitutional provision and consequently the question of whether or not an Act of the Legislature permits the taking of property for other than a public use necessarily presents a judicial question. City of Cincinnati v. Vester, 281 U.S. 439, 50 S.Ct. 360, 74 L.Ed. 950; Fallbrook Irrigation Dist. v. Bradley, 164 U.S. 112, 159, 17 S.Ct. 56, 41 L.Ed. 369, 388; 2 Nichols, Eminent Domain, § 7.4; 18 Am. Jur. 675, Eminent Domain, § 46; 16 Tex. Jur. 577, Eminent Domain, § 15. The declaration of the Legislature upon the subject, however, is entitled to great weight and respect in arriving at a final decision of the question. Not only is the Legislature one of the coordinate branches of government under our constitution, but it is the final arbiter of matters legislative, subject

only to the constitution, which is the superior legislative charter. The judicial process comes into action only to vindicate this superior and paramount legislative enactment. We are also mindful of the fact that the Legislative branch through its use of committees and other fact finding methods may perhaps occupy a more favorable position than a judicial body in determining what is necessary to a successful operation of a municipal enterprise such as a port. The emergency declared by the Legislature in passing the 1947 amendment upon a suspension of the rules, was that "this legislation is necessary immediately to permit the districts affected to provide for the industrial development of lands adjacent or accessible to the navigable waters and ports developed by them". We therefore have a direct Legislative declaration, both in the body of the Act and in the emergency clause, that the taking of lands under the power of eminent domain for industrial development is a taking for "a public purpose and a matter of public necessity."

The appellants strongly urge that the Legislature by the 1947 amendment has attempted to adopt the "recoupment theory" of eminent domain. Particular emphasis is placed upon the statutory provisions allowing the land acquired by condemnation to be leased to private persons or corporations and the proceeds realized thereby used "for the maintenance and operation of the business of such districts and for the purpose of making (the districts) self-supporting and financially solvent and returning the construction costs of their improvements within a reasonable period."

 The term "recoupment theory" may be somewhat misleading as the mere fact that a municipal district, through its legitimate operations, may be expected to meet its expenses and even pay for the construction costs of its plant and facilities, does not render its exercise of the power of eminent domain illegal. Under the American authorities, the proper use of the power of eminent domain is exceeded when and, only when the municipality condemns land for *a use unconnected with its legitimate purposes,* and simply in order to meet the costs of its proper objectives. A good example of the "recoupment theory" is contained in 2 Nichols, Eminent Domain, § 7.5122(3):

"It often happens in old and densely populated cities that the narrowness and crookedness of the public ways and the minute subdivision of the adjoining land in the business districts seriously retards the prosperity and growth of the community. To rectify such conditions by a general widening and straightening of the public ways, or by the laying out of broad, new thoroughfares through the heart of the congested district, would be inordinately expensive on account of the heavy damages that would be claimed by the owners of buildings cut in halves and of land left incapable of beneficial use. No lasting benefit to the public would accrue if the minute subdivision of the land left in private ownership continued, so that buildings appropriate to the improved conditions could not be erected thereon.

"In London and some other European cities the difficulty is solved by laying out a broad, straight highway through the section of the city which it is desired to improve, and by taking land on both sides of the new street for a considerable depth. Entire parcels are taken and thus no question of damages to remaining land is left open. After the new street is built the land on either side is cut up into lots of appropriate size and shape and sold to private purchasers, the profit from the transaction often going far toward paying the whole cost of the improvement. Such an enterprise, although sanctioned in countries in which the power of the legislature is not restricted by a written constitution, involves the taking of the property of one person and the sale of it to another for his own private use and, until recently at least, was impossible anywhere within the United States on

account of the provisions of the state constitutions."

 In our opinion the decision of the Legislature that the acquisition of property under the power of eminent domain by a navigation district "for or in aid of the development of industries upon said lands" does not constitute a commitment to or adoption of the "recoupment theory" of eminent domain. The providing of land for industrial sites is not foreign to the legitimate objectives of the district. As above indicated, if a use be in fact public, it is not rendered otherwise by the expressed hope or desire of the Legislature that the district become self-supporting and not remain a drain or charge upon the general resources of the State. On the other hand, one of the tests of a "public use" is whether or not the purposes for which the land is acquired are reasonably essential to a successful operation of the municipal district.

 Upon this point, as said in appellee's brief, the legislative declaration of "public use" is supported by facts well within the realm of common knowledge. The Texas Gulf Coast is one of the rapidly developing industrial sections of the United States. Vast petroleum refining and petro-chemical plants are now located within the area, because of the presence of oil and gas in large quantities and the close proximity to sea water, which is an important chemical factor in certain industries. In order to provide economical transportation for the products of industry, as well as those of agriculture, natural harbors have been deepened and improved. The great intracoastal canal has been dredged from the Rio Grande to the Sabine, connecting with a vast system of inland waterways that serve the Mississippi watershed, and the entire Gulf and East Coast area of the country. The proposed Port Mansfield is to serve as a gathering point and shipping station upon this system. We think it a matter of common knowledge that on the Texas Gulf Coast industrial development and the successful operation of ports located upon either the canal or the gulf go hand in hand. Both are essential, one to the other.

However, reliance need not be placed alone upon matters of common knowledge. In the testimony of F. W. Hofmokel, general manager of the Brownsville Navigation District and director of the Port of Brownsville, we have a picture of the operations of a modern gulf port and its incidental activities. According to Hofmokel, the Port of Brownsville, or the navigation district, owns 15,682.78 acres in fee simple and has a perpetual easement on 3,446.98 additional acres. A total of 6,191.49 acres have now been developed, 321.49 acres are occupied by docks, warehouses, utility lines, etc., 5,870.01 acres are used for purposes of industrial development. The names of the lessees give an idea of the chemical and petroleum development of the region: Carthage Hydrocol, occupying 222.18 acres, with an easement for over five thousand acres for cooling ponds; Gulf Atlantic Warehouse Company; Rio Grande Compress Company; Port Fuel Company; Texas Petroleum Trading Company; Pemex Company (the petroleum company owned and controlled by the Mexican government) and numerous others.

 We hold that the acquisition of land for the purpose of leasing the same as industrial sites in the proximity of a port is reasonably necessary to the successful operation of such port. Such use comes well within the definition of "public use" as laid down in the case of Housing Authority of City of Dallas v. Higginbotham, 135 Tex. 158, 143 S.W.2d 79, 130 A.L.R. 1053, wherein the matter was exhaustively examined in a well considered opinion written by Mr. Justice Slatton, one of our ablest judges, who had the benefit of elaborate notes upon the subject prepared by the late Chief Justice Cureton. We need not add to what was there said with an abundant citation of applicable authorities.

Our holding of the point is likewise supported by the federal decisions. People of Puerto Rico v. Eastern Sugar Associ-

ates, 1 Cir., 156 F.2d 316, writ of certiorari denied 329 U.S. 772, 67 S.Ct. 190, 91 L.Ed. 664; Old Dominion Land Co. v. U. S., 269 U.S. 55, 46 S.Ct. 39, 70 L.Ed. 162. The cited cases are authority for the proposition that the courts should not intervene where the particular undertaking of the Legislature has a real and substantial relation to the public use, and is not an impossibility. Consequently, the implied declaration by the legislative branch of government, that a taking under a right of eminent domain was for the public use, will be given deference by the courts, until it is shown to involve an impossibility. And while (as appellee says) the taking of land by the navigation district at a locality so distant from its public port and waterway that it could have no substantial relationship with the development of the port itself, would be an impossibility, the statute does not permit such taking, but on the contrary provides that the land must be "adjacent or accessible to the navigable waters and ports developed by them".

We hold that the acquisition of lands for industrial development by a navigation district is for a public use, and that the amendment of 1947, Article 8263h, § 50, Vernon's Ann.Tex.Stats., is constitutional.

Considering the grant of authority contained in the statute, as well as the underlying constitutional basis for the creation of the district, Article 16, § 59, we are likewise of the opinion that it appears as a matter of law that the Board of Navigation and Canal Commissioners did not abuse the discretion vested in it by law, either in deciding that a total of 1,760 acres was necessary to meet the needs of the district or that a fee title rather than a perpetual easement should be condemned. Issues upon both of appellants' contentions, i. e., the extent of the tract and the nature of the title to be secured, were submitted to the jury and answered favorably to appellee. As we view the record, however, no jury question was involved. The law invests the board with the power and authority to decide, but does not constitute a jury as a reviewing body of the board's decision. The question

of an abuse of discretion on the part of a quasi-legislative body or an administrative board is one of law for the court. In arriving at a final decision there may be issues of fact involved, but the ultimate inference or conclusion to be drawn is one for the court. Meaney v. Nueces County Navigation Dist. No. 1, Tex.Civ. App., 222 S.W.2d 402, wr. ref. Here there is no substantial dispute as to facts bearing upon the issue of abuse of discretion. The record shows that the Board proceeded after due deliberation and investigation. It had received a request from the United States government, acting through Army Engineers, that 1,000 acres be provided for a spoilage area, and had also received and acted upon a report of a firm of consulting engineers recommending that a total of 1,760 acres be acquired for spoilage areas, port facilities and industrial development. It cannot be said that the action of the board was arbitrary and without governing principle. Housing Authority of City of Dallas v. Higginbotham, 135 Tex. 158, 143 S.W.2d 79, 130 A.L.R. 1053; Mangan v. Texas Transportation Co., 18 Tex.Civ.App. 478, 44 S.W. 998; National Association of Audubon Societies v. Arroyo Colorado Navigation Dist., Tex.Civ. App., 110 S.W.2d 150; Brazos River Conservation & Reclamation Dist. v. Harmon, Tex.Civ.App., 178 S.W.2d 281; Meaney v. Nueces County Nav. Dist. No. 1, Tex.Civ. App., 222 S.W.2d 402.

Before considering those points in appellants' brief which relate to alleged errors largely of a procedural nature, we will consider the assertion that the 107th District Court was without jurisdiction of these proceedings, but that such jurisdiction was vested in the County Court of Willacy County.

By an Act of the Forty-ninth Legislature, 1945, p. 472, Article 199 (107), Vernon's Ann.Tex.Stats., the Criminal District Court of Nueces, Kleberg, Kenedy, Willacy and Cameron Counties, was re-constituted as a court of general jurisdiction with the power and authority of a constitutional district court. Its territorial jurisdiction was lim-

ited to Cameron and Willacy Counties, and it was designated as the 107th District Court. By Acts 1949, 51st Legislature, Regular Session, p. 678, ch. 351, Article 199 (107) Vernon's Ann.Tex.Stats., was amended by adding a new section thereto, designated as 5a, which conferred certain jurisdiction formerly possessed by the County Court of Willacy County, upon the 107th District Court. At a subsequently called session of the Fifty-first Legislature, said subdivision 107 of Article 199, as amended by the Acts of the Regular Session, 51st Legislature, p. 678, ch. 351, was further amended so that section 5a of subdivision 107 of Article 199, now reads in part as follows:

"Section 5a. In addition to the jurisdiction vested in the 107th District Court under the Constitutional and General Laws of the State, said court shall have and exercise jurisdiction over all civil matters over which, by General Law, the County Court of Willacy County would have original jurisdiction except as in this Act otherwise specially provided, *and shall have and exercise jurisdiction over all appeals in condemnation proceedings.* * * *" Acts 1950 51st Leg., First Called Session, p. 96, ch. 33.

The words above italicized, "and shall have and exercise jurisdiction over all appeals in condemnation proceedings", were added by the amendement adopted at the called session.

Appellants contend that the proceedings held in a county court, whenever one party is dissatisfied with the decision of special commissioners, are not appellate in nature, inasmuch as Article 3266, § 6, Vernon's Ann.Tex.Stats., provides that such "cause shall be tried and determined as in other civil causes in the county court." As explanatory of such proceedings, appellants cite Johnston v. Galveston County, Tex. Civ.App., 85 S.W. 511.

▇ In a sense, however, the proceedings taking place in the county court, after a dissatisfied party has invoked its juris-

diction in accordance with the provisions of Article 3266, may be considered as appellate, although the award of the special commissioners is not directly reviewed but the case is tried de novo. Suits in district courts, or other judicial tribunals seeking to set aside an order or award of an administrative body are commonly referred to as "appeals," particularly when expressly provided for by statute. It was in a similar sense that the Legislature employed the words, "all appeals in condemnation proceedings." We hold that the Legislature intent, as determined by the language employed in the Act here involved, was to transfer the jurisdiction to determine causes under Article 3266, § 6, from the County Court of Willacy County to the 107th District Court. The court below had jurisdiction of this case.

▇ We are of the opinion that no reversible error is disclosed by the trial judge's action in overruling the motion for change of venue. It was contended that as certain of appellants were descendants of Richard and Henrietta M. King and the property involved was originally part of the King Ranch, appellants because of local prejudice could not obtain a fair trial in Willacy County. We regard the evidence on the point as being conflicting. Although a number of special issues were submitted to the jury, it appears that most of them were unnecessary, as in the main this is a cause for legal determination. As to the damage issue, which was for the jury, the award was for $6,213, and there is no indication in the evidence that the sum was inadequate.

Article 8263h, § 34, Vernon's Ann.Tex. Stats., provides that condemnation proceedings on behalf of a navigation district "shall be instituted under the direction of the navigation and canal commissioners, and in the name of the navigation district, and the assessing of damages shall be in conformity to the statutes of the State of Texas for condemning and acquiring the right of way by railroads; * * *." Article 6336 provides that when a railroad corporation and the owner of property·

sought to be acquired for right of way are unable to agree upon terms for the purchase of the property, the railroad corporation "may acquire such property by condemnation thereof."

█ This provision of the statute serves a useful purpose in preventing needless appeals to the courts when the matter may have been settled by negotiations between the parties. Appellant here contends that there is no showing of an effort on the part of the officials of the navigation district to agree with the owners of the land upon a price to be paid for the property desired, and that such showing is essential to the maintenance of a condemnation suit. Isaac v. City of Houston, Tex. Civ.App., 60 S.W.2d 543; Malone v. City of Madisonville, Tex.Civ.App., 24 S.W.2d 483, 16 Tex.Jur. 741, Eminent Domain, § 125. This requirement must be given a reasonable interpretation in keeping with the purpose sought to be accomplished. It appears that negotiations were had between Charles Johnson, the appellee's port director, and Thomas Hart Fisher, who was not only a part owner of the land involved but also an attorney at law representing the other owners, Edwin K. Atwood and Alice B. Atwood. While Fisher possessed no authority to bind his co-owners to convey land, he was authorized to negotiate and submit propositions of purchase to them. Negotiations were had with Fisher with reference to the acquisition of an easement by perpetual lease, but no agreement was reached. On April 5, 1948, the directors of the district turned down a tentative proposal by Fisher; notified him by telegram of this action two days later and submitted a proposal to pay $2 per acre for the fee simple title to the lands desired. This counter proposition was not accepted with the result that condemnation proceedings were instituted on April 14, 1948. This being the state of the record, we hold that there was no evidence supporting the conclusion that the officials of the district had not attempted to arrive at an agreement with the land owners relating to terms of purchase before condemnation proceedings were instituted.

█ It is also asserted by appellants that the condemnation proceedings must fall because the tract of land involved is not described with sufficient certainty that it can be located upon the ground. The description of the property is as follows:

"Being out of and a part of the San Juan de Carricitos Grant in Willacy County, Texas, described by metes and bounds as follows:

"Starting with the U. S. Coastal and Geoditic Survey, permanent bench Sauz, which is located as latitude 26 degrees, 32 minutes, 16.012 seconds and longitude 97 degrees, 25 minutes, 13.527 seconds;

"Thence, at an azimuth 202 degrees, 32 minutes, for a distance of 351.4 feet to the south-east corner of the proposed tract;

"Thence, west (azimuth 270 degrees, 0 minutes), for a distance 7,940 feet to the south-west corner of said tract;

"Thence north (azimuth 0 degrees, 0 minutes) for a distance 11,880 feet to the north-west corner of said tract;

"Thence east (azimuth 90 degrees, 0 minutes), for a distance of 5,280 feet to the north-east corner of said tract; this corner being a point on the shore line of Red Fish Bay;

"Thence generally southward, following the ordinary high tide line of Red Fish Bay, to before-mentioned starting point of the tract, same being the southeast corner of the tract;

"Containing 1760 acres of land, more or less."

Colonel Frank H. Newman, Jr., a civil engineer and member of the firm of Lockwood and Andrews, consulting engineers of Houston, Texas, testified that a competent surveyor would have no difficulty in locating the above-described tract upon the ground. We think his testimony was obviously correct. The purpose of the notes was to describe a tract of land bounded on the east

by the shoreline. The southeast corner therefore lies in the shoreline where it is intersected by the south boundary line of the tract. This is true despite the fact that a point from "Sauz" at an azimuth 202 degrees, 32 minutes and a distance of 351.4 feet may not locate a point exactly upon the shoreline. The azimuth (the angle from true north made by turning to the right or clockwise therefrom) and distance calls from "Sauz" describe a definite fixed point upon the surface of the earth. The southwest corner of the tract is due west (azimuth 270 degrees) a distance of 7,940 feet therefrom. The northwest corner is due north (azimuth 0 degrees a distance of 11,880 feet from the southwest corner. These two corners are definite fixed inland points. The north and south boundary lines of the tract are likewise definitely fixed by such points and the azimuth calls therefrom. The northeast and southeast corners of the tract are located where these lines intersect the shore line. While changes in the shore line, due to wind and sea erosion may occur, it is only the shore line boundary of the tract which would shift as a result thereof. In determining the boundaries of a tract of land it is important to ascertain where upon the ground the surveyor intended it to be located. 7 Tex.Jur. 121, Boundaries § 4. In the present case this may best be done by locating the inland unchanging corners from the benchmark, "Sauz", a designated point on the earth's surface, accurately described by latitude and longitude by three place decimals, and constructing the survey therefrom.

It is also said that the description is rendered indefinite because the shore line, which is generally the eastern boundary line, in some points crosses the south boundary. In other words, an indentation of the bay runs westerly into the land and then turns south and crosses the south boundary line of the tract. Colonel Newman followed the south boundary line as set forth in the field notes, rather than the shore line, in reconstructing the south boundary line. In this he was simply following the field notes in accordance with a correct procedure.

It is further suggested that there is error in the judgment for the reason that the interest in the land condemned was described in the judgment as, "the fee simple title to the surface (exclusive of minerals and all mineral rights)," while in certain preliminary proceedings, such as the application for condemnation and the award of the special commissioners, the estate sought to be condemned is described as "the fee simple title to the surface and an easement on the mineral rights." This variance, if it can be so called, in no way operated to the prejudice of appellants, as the estate finally condemned and described in the judgment of the district court was obviously the lesser estate.

We have examined and considered all of appellants' points of error. In our opinion, none of them discloses a reversible error and the judgment appealed from is accordingly affirmed.