IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————

No. 93-1127

———————————

CITY OF ARLINGTON, TEXAS,

                              Plaintiff-Counter Defendant
                              Appellant-Cross Appellee,

versus

GOLDDUST TWINS REALTY CORPORATION,

                              Defendant-Counter Plaintiff
                              Appellee-Cross Appellant,

B/R RANGERS ASSOCIATES, LTD.,

                              Defendant-Appellee.


———————————

Appeals from the United States District Court
for the Northern District of Texas

———————————

(December 21, 1994)

Before  JOHNSON, HIGGINBOTHAM, and DAVIS, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

    The City of Arlington, Texas appeals the district court's judgment invalidating Arlington's condemnation of a leasehold interest owned by the Resolution Trust Corporation and Golddust Twins Realty Corporation.  We find that Arlington exercised its eminent domain power for a valid public purpose.  That Arlington's stated purpose for taking the property differed from its actual purpose is not a basis for invalidating this condemnation.  Accordingly, we reverse and remand so that the district court may determine the compensation due the condemnees.

I.

A.

Arlington owns parcel C, the land at issue in this case. Parcel C was encumbered by a long-term lease of which the RTC and Golddust each owned a fifty percent interest.[1] In October 1989, Arlington and the Texas Rangers baseball club began discussing the feasibility of creating a new ballpark complex at the site of the old baseball stadium. The Rangers considered the old stadium inadequate and were considering moving to another city. On December 4, 1990, Arlington and the Rangers entered into a Master Agreement for the development of a new ballpark complex. Pursuant to the Agreement, Arlington created the Arlington Sports Facilities Development Authority, Inc. (ASFDA), which was charged with acting on behalf of Arlington in the construction, development, and financing of the project. Under the Master Agreement, ASFDA agreed to build a new ballpark, a ballpark for children, a learning center for children, a hall of fame facility, an amphitheater, a ballpark complex transportation system, a riverwalk, and a linear park.

The Master Agreement also provided for a land swap. The Agreement contemplated that the Rangers would transfer to Arlington 12.714 acres of land, designated as parcels A and B. In exchange, Arlington would transfer to the Rangers parcel C, containing roughly the same acreage. These parcels of land are close to the

_____

[1] The RTC has since assigned its interest in this lawsuit to B/R Rangers Associates, Ltd. The Rangers elected not to file a brief in this appeal, and the organization does not adopt the position of either Arlington or Golddust. The remainder of this opinion refers to RTC and Golddust as simply "Golddust."

new ballpark.  See Appendix.  The Master Agreement does not restrict the Rangers' use of parcel C, and Golddust introduced evidence that the Rangers intended to construct office buildings on the land at some future time.

On November 12, 1991, the Board of ASFDA passed a resolution declaring a need to acquire the land encumbered by the leasehold estate.  Realizing that it would be awkward for ASFDA to condemn land owned by Arlington, ASFDA decided to let Arlington condemn the leasehold interest.  On December 3, 1991, the Arlington City Council resolved to condemn the leasehold interest so that the land could "be improved and used as a parking facility . . . ."  On May 5, 1992, Arlington took possession of the unimproved property.  Shortly thereafter, Arlington graded and asphalted the tract at a cost of more than $644,000.  Parcel C was used for parking for the old stadium during the 1992 baseball season.  The Rangers operated the parking lot and received all parking revenue.  For the priority use privileges and right to receive all revenue generated by the leasehold property, the Rangers agreed to pay Arlington $1.00 per year.  This arrangement would terminate once Arlington transferred the property to the Rangers.

On June 23, 1992, ASFDA leased the new ballpark facilities to the Rangers.  Although parcel C is not considered part of the facilities, section 5.1(b) of the Master Lease requires that the Rangers:

> agree[] to consider, and to cause the provision for, adequate parking space and facilities for the Facilities in connection with any proposed development of . . . (ii) the land designated as Parcel C . . . .  The term "adequate" as used in

3

this Section 5.1(b) shall mean in compliance with all applicable zoning and code requirements of the City and the rules and regulations of the Commissioner and the League.

B.

This appeal arises out of the condemnation proceeding Arlington filed in 1991 against the RTC and Golddust. Arlington filed the action in state court, but the RTC removed to federal court. Golddust challenged Arlington's right to condemn the leasehold, claiming that the actual use to which Arlington sought to put the condemned land was not a public use.

The district court bifurcated the trial. The first phase would determine the propriety of Arlington's condemnation, and the second would examine the issue of statutory recovery. In the first phase the court asked the jury the following question:

Do you find from a preponderance of the evidence that when City of Arlington undertook to condemn the leasehold estate in question it did so with the intent that the property in question would be improved and used as a parking facility?

The jury answered "No." The district court properly hedged the question of whether the issues were for judge or jury by adding its own finding. The court found that "[t]he evidence developed by Golddust and RTC . . . made an exceptionally strong case that [Arlington] has not been honest in its assertions that the taking was for use of the property as a parking facility . . . ." Once the evidence established that Arlington had not been honest in its statement of purpose, the court held that the burden was on Arlington to come forward with a valid public purpose. The court recognized that "any public purpose might be deemed to be sufficient to uphold [Arlington's] taking inasmuch as there is no

4

remainder of the property taken that must be valued in the light of the use to which the property taken is to be put."  Believing that Arlington's failure to discharge its burden to state a true public purpose was dispositive, it concluded that Arlington had not properly exercised its eminent domain power.  The court also held, however, that Golddust was not entitled to damages because Arlington's temporary possession did not reduce the value of the leasehold.  The court awarded costs and fees to Golddust and the RTC.

Arlington appeals the district court's finding that the condemnation was wrongful, and Golddust appeals the district court's refusal to award damages.

## II.

### A.

Article I, section 17 of the Texas Constitution mandates that "[n]o person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation . . . ."  The public use limitation of the Texas Constitution is also found in the Legislature's delegation to municipalities of the power of eminent domain.  See Tex. Loc. Gov't Code Ann. § 251.001(a) (Vernon 1988).  Section 251.001(a)(5) authorizes a municipality to condemn land "for any . . . municipal purpose the governing body considers advisable."  However, taking property for private use under the guise of public use violates due process and constitutes a legal fraud upon property owners even if there is no fraudulent intent.

Saunders v. Titas County Fresh Water Supply Dist. No. 1, 847 S.W.2d 424, 427 (Tex. App.--Texarkana 1993, no writ); Whitfield v. Klein Indep. Sch. Dist., 463 S.W.2d 232, 235 (Tex. Civ. App.--Houston [14th Dist.], writ ref'd n.r.e.), cert. denied, 404 U.S. 882 (1971); City of Wichita Falls v. Thompson, 431 S.W.2d 909, 910 (Tex. Civ. App.--Fort Worth 1968, writ ref'd n.r.e.).

Public use presents a judicial question. Maher v. Lasater, 354 S.W.2d 923, 925 (Tex. 1962); Davis v. City of Lubbock, 326 S.W.2d 699, 704 (Tex. 1959); Housing Auth. of City of Dallas v. Higginbotham, 143 S.W.2d 79, 83 (Tex. 1940). At the same time, a legislative declaration of public use is entitled to considerable deference. See Maher, 354 S.W.2d at 925; see also Tenngasco Gas Gathering Co. v. Fischer, 653 S.W.2d 469, 475 (Tex. App.--Corpus Christi 1983, writ ref'd n.r.e.) (legislative declaration "is binding on the court unless it is manifestly wrong or unreasonable, or the purpose for which the declaration is enacted is clearly and [palpably] private") (citation and internal quotation marks omitted); Daniel B. Benbow, Public Use as a Limitation on the Power of Eminent Domain in Texas, 44 Tex. L. Rev. 1499, 1502 (1966) ("The issue is not . . . whether the use is public, but rather whether the legislature could have reasonably considered it to be public."). A municipality's exercise of the power of eminent domain is a legislative act. Luby v. City of Dallas, 396 S.W.2d 192, 197 (Tex. Civ. App.--Dallas 1965, writ ref'd n.r.e.); see also Burch v. City of San Antonio, 518 S.W.2d 540, 542-43 (Tex. 1975).

6

The district court held that since parking was not the true purpose of the condemnation, Arlington had the burden to state an alternative purpose. When Arlington failed to come forward with an alternative purpose, the court concluded that Arlington wrongfully condemned Golddust's interest.[2] We must disagree. The district court's decision is narrowly tailored and does not purport to hold that Arlington condemned for an impermissible private purpose or that Arlington's true purpose was a permissible public purpose. As we see it, burdens of proof notwithstanding, Golddust's evidence that Arlington was dishonest in its statement of purpose, ironically, established that Arlington's actual purpose in condemning parcel C was a public purpose.

The district court relied on Franklin County Water Dist. v. Majors, 476 S.W.2d 371 (Tex. Civ. App.--Texarkana 1972, writ ref'd n.r.e.). In Majors, the property owners challenged the water district's right to condemn land above a certain elevation on the

---

[2] Both state and federal procedure require that a condemning authority state the purpose for which it intends to condemn a property interest. See Fed. R. Civ. P. 71A(c)(2) (must state "use"); Tex. Prop. Code Ann. § 21.012(b)(2) (Vernon 1984) (must state "purpose"). The district court relied on Texas law for this requirement; however, Rule 71A(k) mandates that, except for the issue of whether a jury may hear the case, a federal court hearing a condemnation case under a state's power of eminent domain must follow the procedures in Rule 71A. See Village of Walthill, Neb. v. Iowa Elec. Light & Power, 228 F.2d 647, 653 (8th Cir. 1956). The district court's erroneous application of section 21.012 was not harmful because Rule 71A(c)(2), like section 21.012, requires that the condemnor's complaint contain a statement of the purpose or use for which the property is to be taken. See Davis, 326 S.W.2d at 709 ("The words 'public purpose' are no narrower than the words 'public use'").

basis that it was taken for the improper purpose of cabin sites and trailer camps. The court upheld the Majors' challenge on the grounds that when the district condemned excess lands for purposes not authorized by the statute, it abused its discretion as a matter of law. Id. at 374.

We disagree with the district court's reading of the rule in Majors. In Majors, the landowners demonstrated that the district condemned their property for the unauthorized purpose of leasing the land for cabin sites and trailer camps. Id. at 373-74. In this case, by contrast, the district court found only that Arlington did not intend to condemn parcel C for use as parking; the court did not make any findings as to actual purpose. Golddust's burden should have been to show that Arlington condemned parcel C for an unauthorized purpose. See Thompson, 431 S.W.2d at 910. Texas cases evidence a reluctance to invalidate an exercise of eminent domain power except when there is a finding of unauthorized purpose. See Majors, 476 S.W.2d at 373-74; Brazos River Conservation & Reclamation Dist. v. Harmon, 178 S.W.2d 281, 289-90 (Tex. Civ. App.--Eastland 1944, writ ref'd w.o.m.).

Golddust argues that misstatement of purpose alone invalidates a condemnation, pointing to cases holding that land condemned for one purpose cannot be used permanently for a different purpose. See Muhle v. New York, Tex. & Mexican Ry. Co., 25 S.W. 607, 609 (Tex. 1894); O'Neal v. City of Sherman, 14 S.W. 31 (Tex. 1890); see also 32 Tex. Jur. 3d Eminent Domain § 92 (1984); Dan Moody, Jr., Condemnation of Land for Highway or Expressway, 33 Tex. L. Rev.

8

357, 364 (1955).  Golddust also cites dicta in <u>City of Dallas v. Malloy</u>, 214 S.W.2d 154, 156-57 (Tex. Civ. App.--El Paso 1948, writ dism'd), for the proposition that

> while property condemned for one purpose may be used temporarily for another, it may not be condemned for one purpose and appropriated to another use. . . . [T]he City having designated the purpose to which the property was to be devoted as the site of a City Auditorium, it may not abandon that purpose and devote it permanently to an automobile pound, or if it had the intention to so use it rather than for the purpose stated, then the property owner had the right to challenge the use and make proof of the allegations if it could be done.

In rebuttal, Arlington points to <u>Malloy</u>'s concurring opinion, in which two of the three judges took issue with the majority author's dicta, stating:

> [W]here the use for which property is sought to be taken under the power of eminent domain is public, the necessity and expediency of exercising the power, and the extent to which the property thereunder is to be taken, are political or legislative, and not judicial, questions, the legislative determination of which is conclusive, and not reviewable by the courts.  These questions rest solely within the legislative discretion. . . . <u>If it had any ulterior motive as to its intended use of the property, the better rule and the usual practice is that such may not be shown in the condemnation proceeding.</u>

<u>Id.</u> at 157 (concurring opinion) (emphasis added; internal quotation marks omitted).

We are persuaded that the concurring opinion in <u>Malloy</u> correctly states Texas law.  Golddust and the majority author in <u>Malloy</u> both rely on cases involving condemnation of an easement or of property for a specific use.  In those cases, an accurate statement of purpose is necessary to provide the appropriate measurement of damages.  In <u>O'Neal v. City of Sherman</u>, for instance, the landowners deeded a portion of their property to the

9

city "for street purposes and none other."  14 S.W. at 31.  When the city began boring a number of wells on the property, the O'Neals sought an injunction.  The court held for the O'Neals, explaining that "[t]he rule that land taken by the public for a certain use cannot be appropriated to another use to the detriment of the owner affords the only adequate protection of the citizen's constitutional right to be compensated for the condemnation or use of his property for the public benefit."  Id. at 32; see also Muhle, 25 S.W. at 609; Lyon v. McDonald, 14 S.W. 261, 263 (Tex. 1890).  If the taking is of the entire interest, on the other hand, the condemnor's intended use of the property is irrelevant to the issue of damages.  See Uehlinger v. State, 387 S.W.2d 427, 432 (Tex. Civ. App.--Corpus Christi 1965, writ ref'd n.r.e.) (where entire property is condemned, court cannot consider the condemnor's purpose in fixing the owner's compensation).[3]

In sum, as the district court noted, there is a significant distinction between condemning property for a specific use and condemning an entire fee.  A court's invalidation of a condemnation on the grounds that land condemned for one purpose may not be used for another is only proper when the situation specifically requires an accurate statement of purpose.  We are persuaded that under Texas law when a political entity condemns the entire interest in land, stating that the condemnation is for A when, fully stated,

---

[3]    Because Arlington owns the underlying fee interest in parcel C, when it condemned Golddust's leasehold interest, the result was that it owned the entire fee.  Thus, this case does not fall into the category of a partial taking.

10

the purpose includes B there is no cause for setting aside the condemnation, so long as B is also a public purpose.  See Malloy, 214 S.W.2d at 157 (concurring opinion).

C.

Jurisdictions define "public use" in different ways.  Some have adopted a "public benefit" or "public advantage" approach under which "any use which serves to enlarge resources, encourage industry, or promote the general public welfare is a valid public use."  Benbow, supra, 44 Tex. L. Rev. at 1500 n.8.  Other jurisdictions, including Texas, have adopted a narrower view. Under the "use by the public" approach, property can only be taken when "there results to the public some definite right or use in the business or undertaking to which the property is devoted."  Borden v. Trespalacios Rice & Irrigation Co., 86 S.W. 11, 14 (Tex. 1905), aff'd per curiam, 204 U.S. 667 (1907); see also Coastal States Gas Producing Co. v. Pate, 309 S.W.2d 828, 833 (Tex. 1958).  It follows then that one of the tests for public use is whether the property taken is "reasonably essential" to successful completion of a project.  Atwood v. Willacy County Navigation Dist., 271 S.W.2d 137, 142 (Tex. Civ. App.--San Antonio 1954, writ ref'd n.r.e.), appeal dismissed, 350 U.S. 804 (1955).

Neither Golddust nor Arlington disputes the fact that stadium parking is a valid public use.  Instead, Golddust claims that transferring the property to the Rangers with the alleged knowledge that at some future date the property will be the site of an office complex renders the use private.  However, the evidence introduced

11

at trial establishes that Arlington's taking was for a public use. It is undisputed that parcel C is currently being used for parking. In addition, section 5.1(b) of the Master Lease obligates the Rangers to provide adequate parking space for the ballpark facilities. Finally, the Master Agreement's land swap provision that necessitated the condemnation of parcel C's leasehold estate was part of the larger ballpark project. Tom Schieffer, president of the Rangers, testified that inclusion of the land swap provision in the Master Agreement was "essential" to the Agreement.

These undisputed facts tie the condemnation to a public use. In Davis, the Texas Supreme Court upheld the Urban Renewal Law against a challenge that it authorized taking of property for private use. The law authorized cities to condemn land designated a slum area. The land would then be cleared for development by private enterprise. The court held that the property was condemned for an authorized public purpose because "the property may not simply be resold for private use; it must be sold subject to restrictions and covenants which are designed to insure that (1) the plans for renewal will be carried out, and (2) that the slum conditions will not recur within the foreseeable future." 326 S.W.2d at 706. One commentator, remarking on the Davis decision, noted that the opinion "at best must be viewed as honoring the narrow public-use concept only in the breach." Benbow, supra, 44 Tex. L. Rev. at 1508.

A similar result was reached in Atwood. Atwood involved the condemnation of land "for the purpose of constructing a port and

12

attendant facilities to be used in connection with the development and operation of navigable waters of the State." 271 S.W.2d at 139. The landowners challenged the constitutionality of a provision in the enabling statute that authorized the condemning authority to lease condemned land to private individuals or corporations. The court rejected this argument, "hold[ing] that the acquisition of land for the purpose of leasing the same as industrial sites in proximity of a port is reasonably necessary to the successful operation of such port." Id. at 142.

Finally, in Coastal States, the court upheld the taking of an easement for the purpose of drilling an oil well because one-fourth of the production was reserved to the state and dedicated to the Permanent School Fund. 309 S.W.2d at 833. In connection with its holding, the court found that "[t]he lessee may make a profit out of the venture, but this in itself does not make the use private rather than public. Since the public has a direct, tangible and substantial interest and right in the undertaking, it is our opinion that the land will be devoted to a public use within the meaning of the Constitution." Id.

By holding that Arlington had the burden to state its actual purpose for condemning parcel C, the district court overlooked the fact that the very evidence offered to prove that the stated purpose was false itself offered a valid public purpose. So, true statement of purpose or not, Arlington condemned Golddust's interest for a public purpose. We lack the authority to intrude into the legislative domain to invalidate an exercise of eminent

13

domain power that so clearly falls within the constitutional limits of public use.

## III.

We REVERSE the decision of the district court and REMAND for proceedings to determine the compensation due to Golddust for the condemnation.