NO. 07-04-0097-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

SEPTEMBER 3, 2004

_____

LANE HARDWICKE, APPELLANT

V.

CITY OF LUBBOCK, TEXAS, APPELLEE

_____

FROM THE 99TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2004-524,931; HONORABLE ANDREW J. KUPPER, JUDGE

_____

Before REAVIS and CAMPBELL, JJ., and BOYD, S.J.[1]

**OPINION**

Appellant, Lane Hardwicke, brings this interlocutory appeal from the denial of his request for a temporary injunction in a declaratory and injunctive action he brought against the City of Lubbock. Hardwicke sought declarations invalidating the statutes and ordinances under which the City was acting and to enjoin the City from pursuing

_____

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment.

condemnation proceedings against property owned by him. We will affirm the trial court's order.

## FACTUAL AND PROCEDURAL BACKGROUND

The litigation concerns a tract of real property owned by Hardwicke and located on 9th Street in Lubbock. The property consists of a single lot, on which is situated a structure built as a residence but now divided into four apartments. The property is located in the North Overton[2] area of Lubbock designated by the City in March 2002 as the North Overton District Tax Increment Finance Reinvestment Zone, under the Tax Increment Financing Act (the Act).[3] *See* Tex. Tax. Code Ann. Ch. 311 (Vernon 2002 & Supp. 2004).

The Act permits a municipality to designate a geographic area as a tax increment reinvestment zone to promote development or redevelopment of the area if it determines that would not occur solely through private investment in the reasonably foreseeable future. § 311.003(a). Private development or redevelopment is facilitated, *inter alia*, by public infrastructure improvements.[4] *See* § 311.011. Both the public works and private

---

[2]The North Overton area generally lies between the downtown center of Lubbock and the campus of Texas Tech University, and is bounded generally by Broadway on the south, University Avenue on the west, Fourth Street on the north and Avenue Q on the east.

[3] Subsequent section references are to the Texas Tax Code Annotated (Vernon 2002), unless otherwise noted.

[4]A key feature of the Act is the method used to finance the public works. *See City of El Paso v. El Paso Community College Dist.*, 729 S.W.2d 296 (Tex. 1986). Under the Act, the taxable value of real property in the zone is determined at the time of the zone's creation. §§ 311.011(c)(7), 311.012(c). During the existence of the reinvestment zone, taxes collected on any increase in value resulting from redevelopment are deposited in a

redevelopment are undertaken pursuant to redevelopment plans approved by the municipality. *Id.*

Section 311.005 of the Act sets out the criteria required of an area designated as a reinvestment zone. The North Overton zone was established in response to a petition of property owners, pursuant to Section 311.005(a)(5),[5] led by entities associated with developer Delbert McDougal that had acquired a significant percentage of the properties in the area.

McCanton Woods, Ltd., is the lead developer in the North Overton zone. It negotiated with Hardwicke to acquire his property. Testimony in the record before us indicates agreement was reached at one point for Hardwicke's sale of his property to McCanton Woods, but ultimately the negotiations were unsuccessful. The Act authorizes municipalities to exercise powers necessary and convenient to carry out plans for reinvestment zones, including the power to acquire real property by condemnation. *See* § 311.008. McCanton Woods requested the City to initiate efforts to acquire Hardwicke's property. In November 2003 the City obtained an appraisal of Hardwicke's property, and in December the City Council authorized condemnation of the property. At that time the

---

tax increment fund. § 311.013. This fund is used to pay public project costs, including the cost of public works. § 311.002(1).

[5]In its ordinance designating the North Overton area as a reinvestment zone, the Lubbock City Council also stated its findings that, *inter alia*, the area is "unproductive, underdeveloped or blighted" within the meaning of article VIII, section 1-g(b) of the Texas Constitution, and impairs the City's growth or constitutes an economic or social liability because of the number of deteriorated or deteriorating structures, faulty lot layout, and deterioration of site or other improvements. *See* § 311.005(a)(1); Op. Tex. Att'y Gen. No. JC-0152.

City sent Hardwicke a letter offering for the property the appraised value, taken from the November appraisal. The City sent a second letter on January 6, 2004, containing a "final offer" in the same amount and informing Hardwicke that failure to accept the offer within ten days would result in the initiation of condemnation proceedings on the property. Hardwicke filed the underlying suit on January 13.

In February 2004, the City Council approved an agreement with McCanton Woods concerning acquisition of Hardwicke's property and another tract in the North Overton reinvestment zone. The agreement recited that McCanton Woods had acquired "a large percentage" of the property in the zone and intended to develop the property in accordance with the zone project plan but was unable to acquire the two parcels "necessary to the implementation of the Amended Project Plan" and that it sought to have the City acquire the property by condemnation. The agreement provided McCanton Woods would reimburse the City for the cost of condemnation, including attorneys fees. The City agreed to take title to the properties acquired by eminent domain, and to transfer them to McCanton Woods "at fair market value, to be used to implement the Amended Project Plan approved by the City Council."

Hardwicke's pleadings[6] sought twelve specific judicial declarations including declarations that sections of the Act and the City's ordinance establishing the reinvestment zone are unconstitutional as applied, the City's designation of the boundaries of the reinvestment zone was arbitrary and capricious and represented "bad faith, fraud and

_____

[6]Our description of the relief Hardwicke seeks comes from his second amended petition, filed February 25. His prior petitions are not in the record provided us.

-4-

collusion," and that his property has historical significance and was entitled to protection. He sought temporary injunctions enjoining the City from instituting or prosecuting condemnation of his property until final judgment on his declaratory action, and from "engaging in any act to diminish the value" of the property or otherwise interfering with his quiet enjoyment of it, and sought permanent injunctive relief.

The trial court conducted a hearing on appellant's application for a temporary injunction on February 10, 2004. The court heard testimony and argument of counsel, and admitted twenty-six exhibits. The court denied appellant's request for temporary relief in a written order filed March 3, 2004. Appellant perfected this interlocutory appeal from that order.[7] *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (Vernon Supp. 2004).

Hardwicke filed a motion for new trial and other relief. By an order signed April 2, 2004, the trial court denied all the relief requested by that motion except for a request to stay condemnation proceedings. The court ordered that condemnation proceedings, including the appointment of special commissioners, were stayed for a stated period of time pending appeal. On the expiration of that stated period, and on Hardwicke's motion, this court continued that stay of condemnation proceedings.

---

[7]Hardwicke's brief states his request for an anti-suit injunction has been rendered moot because the trial court permitted the City to file its condemnation proceeding as a counterclaim. For purposes of this appeal, we view the status quo Hardwicke seeks to preserve as his possession of his property.

## STANDARD OF REVIEW

The purpose of a temporary injunction is to preserve the status quo until a final hearing on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002); *Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 597 (Tex.App.--Amarillo 1995, no writ). A party seeking a temporary injunction must plead and prove: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent and irreparable injury in the interim. *Butnaru*, 84 S.W.3d at 204; *see Letson v. Barnes*, 979 S.W.2d 414, 417 (Tex.App.--Amarillo 1998, pet. denied). A temporary injunction applicant is not required to establish that he will prevail on final trial on the merits of his cause of action; he need only show a probable right on final trial to the relief he seeks. *Butnaru*, 84 S.W.2d at 204, 211; *see Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex. 1968).

A trial court's decision to grant or deny a temporary injunction lies in the court's sound discretion, and we may reverse that decision only if it reflects a clear abuse of discretion. *Butnaru*, 84 S.W.3d at 204; *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993); *Letson*, 979 S.W.2d at 417. An appellate court reviewing that interlocutory decision is not to review the merits of the underlying action, but must strictly limit its review to the inquiry whether there has been a clear abuse of discretion by the trial court in granting or denying the temporary injunction. *Davis v. Huey*, 571 S.W.2d 859, 861-62 (Tex. 1978); *Sherrod v. Moore*, 819 S.W.2d 201, 202 (Tex.App.–Amarillo 1991, no writ). We may not substitute our judgment for the trial court's judgment unless its action was so arbitrary as to exceed the bounds of reasonable discretion. *Butnaru*, 84 S.W.3d at 204.

When, as here, no findings or fact or conclusions of law are requested or filed,[8] the trial court's judgment must be upheld on any legal theory supported by the record. *See Huey,* 571 S.W.2d at 862; *Gurvich v. Tyree*, 694 S.W.2d 39, 43 (Tex.App.–Corpus Christi 1985, no writ). The trial court does not abuse its discretion if some evidence reasonably supports its decision. *Butnaru*, 84 S.W.3d at 211, citing *Huey,* 571 S.W.2d at 862. We are to draw all legitimate inferences from the evidence in a manner most favorable to the trial court's judgment. *Miller Paper*, 901 S.W.2d at 598; *Miller v. K & M P'ship*, 770 S.W.2d 84, 87 (Tex.App.–Houston [1st Dist.] 1989, no writ).

Hardwicke presents a single issue contending the trial court abused its discretion in denying his request for a temporary injunction. He contends that uncontradicted evidence presented at the temporary injunction hearing established his probable right to the declaratory relief he seeks, and that the trial court therefore abused its discretion by misapplying the law to the established facts. We disagree and, without delving into the merits of Hardwicke's claims, conclude that the trial court's denial of his request for a temporary injunction, on the evidence presented to that court, did not reflect an abuse of its discretion.

## Public Use

Hardwicke's primary argument is based on the constitutional provisions limiting the exercise of the power of eminent domain to the taking of property for public use. U.S.

---

[8]A trial court may, but need not, file findings of fact and conclusions of law with respect to an interlocutory order. Tex. R. App. P. 28.1.

Const. amend. 14; Tex. Const. art. I §17.  He argues the evidence shows the property will be sold to the developer for private, rather than public, use.  The public use requirement was addressed by the supreme court in *Davis v. City of Lubbock*, 326 S.W.2d 699 (Tex. 1959), which involved constitutional challenges to a statute allowing use of the power of eminent domain for urban renewal.  *Id.* at 701.  The plaintiffs argued provisions allowing private development of property acquired by condemnation did not satisfy the public use requirement.  *Id.* at 703-04.  The court held the primary purpose of the statute, to clear slum and blighted areas, provides a public use for property taken pursuant to its terms. *Id.* at 709.  Despite differences between the Act and the urban renewal statute examined in *Davis*, Hardwicke has not persuasively distinguished the *Davis* opinion's analysis, and we find it applicable here.  *See also Housing Authority of Dallas v. Higginbotham*, 143 S.W.2d 79, 84, 135 Tex. 158 (1940) (noting court has adopted liberal view of what constitutes public use).

The trial court had before it evidence of the City Council's findings supporting the creation of the reinvestment zone, and evidence concerning the condition of the North Overton area.  That evidence included a June 2002 consultant's report on the feasibility of tax increment financing to encourage redevelopment in the area.  The report described the North Overton neighborhood as an area in distress, characterized by declining population, high vacancy rates, high crime rates and properties in poor condition, with little to attract anyone to the neighborhood other than extremely low values and rents.

Hardwicke relies on a statement in the City's Resolution No. 2002-RO259, by which it adopted tax increment financing policies, that the Act "allows the acquisition of private property for private use in a [tax increment reinvestment zone] project, in accordance with the redevelopment policies of the City . . . ." He contends the statement is contrary to the Act and states a City policy of using its eminent domain power to acquire private property for private use. The City argues that, in its context, the statement does not indicate a policy of acquiring private property by condemnation in violation of constitutional requirements. Regardless whether the resolution's language concerning what the Act allows is accurate, there was ample evidence to permit the trial court to conclude that the City's taking of Hardwicke's property was for a public use. Craig Farmer, the City's managing director of planning and transportation, testified that the economic viability of the North Overton redevelopment depended on the aggregation of properties in some areas of the zone to permit large-scale projects. Farmer also testified that the location of Hardwicke's property made it appropriate that it be included within one of the aggregated areas.

Hardwicke also refers to paragraph 2.1 of the City's Resolution No. 2002-RO258, establishing redevelopment policies for the City, which states:

> The purchase and aggregation of parcels is the responsibility of the developer(s). The City does not intend to use the power of eminent domain to purchase property for private use, unless the City Council agrees that special circumstances exist.

On this record, Farmer's testimony concerning the location of Hardwicke's property, coupled with his testimony concerning the infrequent occasions on which the City Council

-9-

had approved exercise of its right of eminent domain in the North Overton zone, also provides evidence from which the trial court could reasonably have inferred the existence of the "special circumstances."

Another holding of *Davis* is applicable here. Intervenors in *Davis* complained, as does Hardwicke, that clearance of blighted property could not be used to justify taking of their property because the specific structure which the city sought to condemn was not blighted or substandard. 326 S.W.2d at 710. The court there followed the "uniform holdings of the highest courts of other states" that use of eminent domain to eliminate slums requires cities to deal with areas rather than individual properties. *Id.* In *City of Arlington v. Golddust Twins Realty Corp.*, 41 F.3d 960, 966 (5th Cir. 1994), the Fifth Circuit Court of Appeals held the acquisition of an individual property that is "reasonably essential" to successful completion of a public project is an acquisition for a public use. *Id.* at 966. There was evidence at the hearing from which the court reasonably could conclude that acquisition of Hardwicke's property was necessary to carry out the redevelopment plan approved by the City.

### *"Unable to Agree" Requirement*

Hardwicke also points out the requirement in the condemnation statute that a petition for condemnation state the condemnor and the landowner "are unable to agree on the damages." Tex. Prop. Code Ann. § 21.012(b). He contends the City will be unable to meet that requirement because record evidence conclusively shows the City did not engage in negotiations with him or make any bona fide effort to reach agreement with him,

-10-

leaving all negotiations to the developer.  As noted, though, the record contains the City's December 2003 letter to Hardwicke, with its accompanying appraisal report, and the City's January 2004 letter, extending offers to acquire his property for the appraised value. Hardwicke filed his declaratory judgment proceeding shortly after receipt of the January letter.  When he submitted his brief on appeal, Hardwicke did not have the benefit of our supreme court's recent opinion in *Hubenak v. San Jacinto Gas Transmission Co.*, 47 Tex. Sup. Ct. J. 767, 2004 WL 1490396 (Tex. July 2, 2004).  Based on the court's discussion there of the evidence necessary to meet the "unable to agree" requirement, the trial court would have been justified in concluding the requirement was satisfied in this case. Moreover, the record before us does not demonstrate that Hardwicke presented his contention based on the "unable to agree" requirement to the trial court before its denial of the temporary injunction.  The contention cannot, therefore, constitute a basis for concluding the trial court abused its discretion.  *See Sherrod*, 819 S.W.2d at 205.

### *Unlawful Delegation*

Hardwicke argues also that the temporary injunction evidence shows the City improperly has delegated authority to the developer, supporting his probable right of recovery to a declaratory judgment.  He points to evidence that:  the City's policies state selection of properties for redevelopment and acquisition of properties for redevelopment are the responsibilities of the developer; McCanton Woods requested the City initiate condemnation proceedings against him; the City's agreement with McCanton Woods for condemnation of Hardwicke's property calls for the developer to bear all the expenses

-11-

related to the condemnation; the City may convey condemned property to the developer without knowing exactly what use will be made of the parcel; and there is no written agreement between the City and McCanton Woods generally setting out their obligations with respect to redevelopment of the North Overton area. Hardwicke cites cases holding that a municipality's exercise of the power of eminent domain is a legislative act, *Luby v. City of Dallas*, 396 S.W.2d 192, 197 (Tex.Civ.App.–Dallas 1965, writ ref'd n.r.e.), and that a municipality may not delegate its governmental functions to a private party without constitutional authority, *Pittman v. City of Amarillo*, 598 S.W.2d 941, 945 (Tex.Civ.App.–Amarillo 1980, writ ref'd n.r.e.). He also cites *FM Properties Operating Co. v. City of Austin*, 22 S.W.3d 868 (Tex. 2000), in which the supreme court found that a section of the Texas Water Code worked an unconstitutional delegation of legislative power to private landowners. Hardwicke argues that the evidence shows the developer has "absolute discretion to determine prices to be offered for . . . properties, but knowing that he may rely on the City through its purported eminent domain powers if the landowners do not accept the private developer's offer." He further contends the City exercises only "procedural involvement," initiating the condemnation proceeding in its name at the developer's request.

We cannot agree the trial court was restricted, at this interlocutory stage, to Hardwicke's view of the evidence. The record also shows the City had the property appraised by an independent appraiser, and that its offer to Hardwicke was in the amount of that appraisal. The appraiser testified he was given no instructions concerning the amount of his appraisal. The record reflects City Council consideration and approval of the

-12-

proposed condemnation before its authorization of the City's execution of the agreement with McCanton Woods. Delbert McDougal testified he expected the City would convey the property to McCanton Woods promptly after the condemnation, but the agreement between the City and the developer requires the developer to use the property in implementing the project plan approved by the City. On this record, the trial court's failure to find the City unlawfully delegated its eminent domain power to McCanton Woods was not an abuse of discretion.

### Arbitrary Boundaries

Next we address Hardwicke's contention that the boundaries of the redevelopment zone were determined in an arbitrary and capricious manner, as shown by the inclusion of numerous properties that are not unproductive, underdeveloped or blighted, and for which there are no apparent current plans for redevelopment. At the hearing, Hardwicke focused on the inclusion in the zone of properties on the north side of Broadway. In his brief, Hardwicke cites *Malcomson Rd. Util. Dist. v. Newsom*, No. 01-00-1163-CV, 2003 WL 21299939 (Tex.App.–Houston [1st Dist] June 5, 2003, no pet.)(memorandum opinion). That opinion describes arbitrary and capricious action, in the condemnation context, as "willful and unreasoning action, action without consideration and in disregard of the facts and circumstances." It also quotes *Ludewig v. Houston Pipeline Co.*, 773 S.W.2d 610, 614 (Tex.App.–Corpus Christi 1989, writ denied), to the effect that "when there is room for two opinions, an action cannot be deemed arbitrary when it is exercised honestly and upon due

consideration, regardless how strongly one believes an erroneous conclusion was reached." *Malcomson*, slip op. at 7.

The record here contains a map of the reinvestment zone which shows it is a rectangular area with a single inset to avoid passing the boundary through the middle of a building. The zone is bounded on three sides by multi-lane commercial thoroughfares and on the east by the downtown area. With respect to the inclusion of properties on the north side of Broadway, Craig Farmer testified to the need to authorize improvements to utilities serving the blocks adjoining Broadway to the north and improvements to the streets that intersect Broadway. He testified he felt it "absolutely" was necessary to include the properties fronting Broadway in the reinvestment zone. On the basis of that evidence, the court well could have concluded that the City's configuration of the reinvestment zone was not an arbitrary or capricious action.

### *Designation as Historical Property*

Hardwicke's pleadings seek a declaration that his property has historical significance entitling it to be designated an historical property. At the temporary injunction hearing, Hardwicke testified to his research concerning the history of the house located on the property. His research revealed that the house was constructed in 1910 by W. D. Benson, an early-day and prominent Lubbock lawyer. It was located originally in what is now the downtown area of Lubbock and was moved to the lot on 9th Street in 1948 by a later owner. Hardwicke described the architecture of the house as characteristic of New England construction not typically seen in this part of the country. The evidence also included a

-14-

photograph of the house, apparently taken within a few years of its construction. Hardwicke had located the photograph in Texas Tech's Southwest Collection, which includes information on the Benson family. He testified the house should be saved.[9]

In *Seaborg Jackson Partners v. Beverly Hills Sav.*, 753 S.W.2d 242, 244-45 (Tex.App.–Dallas 1988, no writ), the court cited the certification of property by the United States Department of Interior as an historical structure as conclusive proof of its uniqueness and of the inadequacy of a remedy at law for its loss. Hardwicke cites us to no authority, though, establishing that the trial court has the power through a declaratory judgment to determine that a property is entitled to designation as an historical property. Moreover, even if the court had such power, the evidence that the structure had been moved from its original location and divided into four apartments would support a conclusion that Hardwicke has not shown a probable right to such a declaration, against a claim of abused discretion.

## CONCLUSION AND DISPOSITION

Based on the evidence presented, the trial court did not abuse its discretion in failing to find Hardwicke demonstrated a probable right, on final trial, to the declaratory relief his pleadings seek. On appeal, Hardwicke also contends he demonstrated he faces imminent and irreparable injury without a temporary injunction. The City contends the condemnation statutes provide him an adequate remedy. We need not address those contentions

---

[9]To his attorney's question "Do you have any desire to preserve this house because of the - - what you believe to be the historical value or significance of this house?" Hardwicke answered "Well, yes. I think the house should be saved. Yes, I do."

because of our conclusion on the probable right to relief element.  We overrule Hardwicke's sole issue and affirm the order of the trial court.  We also lift our order staying condemnation proceedings.


James T. Campbell
Justice