MALCOMSON ROAD UTILITY
DISTRICT, Appellant,

v.

Frank George NEWSOM, Appellee.

Nos. 01–00–01163–CV, 01–00–01169–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

May 20, 2005.

Rehearing Overruled June 22, 2005.

C. Charles Dippel, Andrews & Kurth L.L.P., Houston, for appellant.

Michael M. Barron, Stephen I. Adler, Barron, Adler & Anderson, L.L.P., Kent A. Sick, Austin, for appellee.

Panel consists of Justices TAFT, KEYES, and HIGLEY.

## OPINION ON REHEARING

TIM TAFT, Justice.

Appellant, Malcomson Road Utility District ("the District"), has moved for rehearing. So has appellee, Frank George Newsom. We grant the District's rehearing motion, deny Newsom's, withdraw our opinion of June 5, 2003, and substitute this opinion in its stead.

The District appeals from two final judgments that denied its motions for partial

summary judgment; granted Newsom's motions for summary judgment; denied the District the right to condemn Newsom's property; awarded Newsom attorney's fees and possession of and improvements on the property that the District had sought to condemn; and dismissed the causes for want of jurisdiction. We determine if fact issues exist precluding summary judgment for either party on the following matters: (1) whether the property was sought for public uses; (2) whether the District's determinations of public necessity were arbitrary and capricious or were made in bad faith; (3) whether the District and Newsom were unable to agree on damages before filing suit; (4) whether the takings violated due process or equal protection; (5) whether the District improperly "delegated" its eminent domain powers to private developers competing with Newsom; and (6) whether Newsom may raise, for the first time on rehearing, a new challenge to the condemnation. We reverse the judgments and remand the causes.

## Background

Newsom owned a northern and a southern tract of undeveloped land outside the District's boundaries. A drainage ditch lay along the eastern boundary of Newsom's northern tract. David Garrett, the vice-president of a corporate landowner that wished to develop its nearby tract into a residential subdivision, tried to purchase 2.6178 acres along the eastern edge of Newsom's northern tract to expand the drainage ditch, which Harris County Flood Control District ("HCFCD") required for development of Garrett's subdivision, called Lakewood Grove. Similarly, John Santasiero, the owner of nearby property that included a residential subdivision, tried to purchase 2.58 acres at the southern end of Newsom's southern tract to build a retention pond that HCFCD re-

quired for development of Santasiero's subdivision, called Villagio. Newsom rejected the offers.

After Newsom rejected their offers, the developers asked the District to condemn the portions of Newsom's land that they had tried to purchase. The District's board eventually determined that the taking of Newsom's land in the requested amounts for the retention pond and ditch expansion was a public necessity that would serve the public purpose of drainage. The District made an offer to Newsom for each piece of land. Newsom rejected outright the placement of a pond on his property. He also rejected the amount offered for the land for the ditch expansion and counter-offered with a higher price.

Upon Newsom's rejections and counter-offer, the District filed separate condemnation proceedings in county court for each piece of property. *See* TEX. PROP.CODE ANN. §§ 21.012, 21.013 (Vernon 2004). We designate these suits the "pond case" (trial court cause number 691,631; appellate cause number 01–00–01163–CV) and the "ditch case" (trial court cause number 691,632; appellate cause number 01–00–01169–CV), denoting the purpose for which the District sought to condemn the land. In each case, the trial court appointed special commissioners, who, after a hearing, awarded damages of $49,021 in the pond case and of $49,739 in the ditch case. *See* TEX. PROP.CODE ANN. §§ 21.014, 21.015 (Vernon 2004). The District deposited the determined amounts into the court's registry, took possession of those portions of Newsom's land, and began improvements on the property. *See* TEX. PROP.CODE ANN. § 21.021(a)(2) (Vernon 2004).

Newsom timely filed original and amended objections to the commissioners' awards. *See* TEX. PROP.CODE ANN. § 21.018(a) (Vernon 2004). He simulta-

neously filed original and amended pleas to the jurisdiction, arguing that the District had not made good-faith offers of damages before filing suit, that his property was being taken for private uses and without public necessity, that the takings were arbitrary and capricious and fraudulent, and that the District improperly "delegated" its eminent-domain powers to the nearby competing developers.

By original and supplemental motions for partial summary judgment, the District argued that (1) under rule 166a(c), it had satisfied all conditions entitling it to condemnation, leaving only the land's value for determination, and that (2) under rule 166a(i), Newsom could produce no evidence supporting his defenses that the District's determinations of public necessity for the condemnations were arbitrary and capricious or unreasonable. *See* TEX.R. CIV. P. 166a(c), (i). By his own motions for summary judgment under rule 166a(c), Newsom argued in both cases that (1) the District's determinations of public use and necessity were arbitrary and capricious, resulted from fraud or bad faith, or were abuses of discretion; (2) the District did not show that the parties were unable to agree on damages before the District filed suit because the District did not make good-faith offers of damages; (3) the District improperly delegated its eminent-domain powers to the competing developers; and (4) the takings violated equal protection and due process.

Without specifying its reasoning, the trial court denied the District's motions for partial summary judgment, granted Newsom's motions for summary judgment, and dismissed the causes for want of jurisdiction. The District appealed. During the trial court's plenary power, Newsom moved to recover statutory attorney's fees, damages arising from the District's temporary taking of Newsom's property, and

possession of the property that the District had temporarily taken. *See* TEX. PROP. CODE ANN. § 21.019 (Vernon 2004), §§ 21.044(a), 21.062 (Vernon 2000). While appeal was pending, we granted the parties' joint motion to abate the appeal and to remand the cause for the trial court to dispose of Newsom's pending motions. On remand, the trial court entered final judgments in each cause, reaffirming its summary judgment rulings, dismissing the District's condemnation suits for want of jurisdiction, awarding Newsom his attorney's fees from trial and contingent attorney's fees for appeal, awarding Newsom damages for the District's temporary taking of his property, and returning to him possession of the disputed property, including awarding him the improvements made by the District to that property during the District's temporary possession.

## Standard of Review and Burden of Proof

Because the parties moved for rule–166a(c) and rule–166a(i) summary judgment, we apply the well-established standards of review applicable to summary judgments. Summary judgment under rule 166a(c) is proper only when a movant establishes that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995). A defendant is entitled to summary judgment if the evidence disproves as a matter of law at least one element of each of the plaintiff's causes of action or if it conclusively establishes all elements of an affirmative defense. *Id.*

A party may move for a "no-evidence" summary judgment under rule 166a(i) "if there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial." *Flame-*

*out Design & Fabrication, Inc. v. Pennzoil Caspian Corp.*, 994 S.W.2d 830, 834 (Tex. App.-Houston [1st Dist.] 1999, no pet.). A no-evidence summary judgment is, therefore, like a directed verdict. *See id.* "The trial court must grant the motion unless the nonmovant produces more than a scintilla of evidence raising a genuine issue of material fact on the challenged elements." *Id.* In reviewing either type of summary judgment, we indulge every reasonable inference in favor of the non-movant, resolve any doubts in its favor, and take as true all evidence favorable to it. *Johnson*, 891 S.W.2d at 644; *Flameout Design*, 994 S.W.2d at 834.

■■■ When both sides move for summary judgment and the trial court grants one motion and denies the other, we can consider both motions, their evidence, and their issues and may render the judgment that the trial court should have rendered. *See CU Lloyd's of Tex. v. Feldman*, 977 S.W.2d 568, 569 (Tex.1998). When an order granting summary judgment does not specify the grounds upon which the trial court ruled, we must affirm to the extent that any of the summary judgment grounds is meritorious. *See Star–Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex.1995).

On rehearing, Newsom urges us to apply a different standard of review from the one applicable to summary judgments. Specifically, Newsom relies on the standard of review adopted in *Hubenak v. San Jacinto Gas Transmission Co.*, which this Court issued shortly before the District filed a supplemental brief on original submission. *See* 65 S.W.3d 791, 798 (Tex. App.-Houston [1st Dist.] 2001) ("*Hubenak II* "), *aff'd*, 141 S.W.3d 172 (Tex.2004) ("*Hubenak III* ").

In *Hubenak II*, the landowners appealed from an adverse condemnation judgment, arguing that the trial court lacked subject-matter jurisdiction because the condemnor had failed to show that it was unable to agree with the landowners on damages, which, they argued, was a jurisdictional prerequisite to filing suit. *Id.* at 796. Although the judgment was rendered on cross-motions for summary judgment, we determined that the proper standard of review for determining whether the unable-to-agree jurisdictional requisite had been satisfied was legal sufficiency of the evidence. *Id.* at 797–98. That is, we deemed the trial court implicitly to have made a plenary factual determination that the condemnor had satisfied this jurisdictional prerequisite, even though the procedural mechanism for that ruling was summary judgment. *See id.* at 798. We then looked for more than a scintilla of evidence in the summary judgment record to support the implied ruling. *See id.* Of course, that standard of review is generally the inverse of the standard applicable to a summary judgment ruling.

We first note that the *Hubenak II* court applied the cited standard of review only to the determination of whether the parties were unable to agree, not to any other determination relevant to a condemnation proceeding. *See id.* at 798. Assuming (as Newsom does) without deciding that the *Hubenak II* standard of review could apply to determinations other than the unable-to-agree requirement, and further assuming without deciding that Newsom may even urge the application of the *Hubenak II* standard of review on appeal,[1]

---

1. *Hubenak II* had not issued when the trial court ruled on the parties' summary judgment motions in this case, and no party's motion urged the application of a *Hubenak II*-style standard of review. In contrast, the parties in *Hubenak* itself had argued during summary judgment for the new standard of review that our Court eventually adopted.

we hold that that standard has been overruled. We reach this conclusion for two reasons.

First, after having noted that the courts of appeals involved in the suits that it was reviewing had applied different standards of review to summary judgment rulings on the unable-to-agree requirement,[2] the *Hubenak III* court held:

> The procedural vehicle chosen by the condemnors to determine whether they were "unable to agree" with the landowners in the cases before us was a motion for partial summary judgment. Trial courts can, however, resolve "unable to agree" issues through other procedural vehicles, as they resolve many threshold pre-trial matters, including ruling on a plea in abatement. Because the issue was raised in the present cases in motions for partial summary judgment asserting that the condemnors established as a matter of law that they were "unable to agree" with the landowners, we must determine whether there are any questions of fact.

*Hubenak III*, 141 S.W.3d at 184–85 (footnote omitted). The supreme court thus applied a summary judgment standard of review in the same suit in which we had applied a legal-sufficiency standard of review. *See id.* By so doing, the supreme court implicitly overruled the standard of review that we had espoused in *Hubenak II*.

Second, when *Hubenak II* was decided, the unable-to-agree requirement was generally considered jurisdictional. *See, e.g., Hubenak II*, 65 S.W.3d at 796. Our standard-of-review holding in *Hubenak II* was grounded on the jurisdictional nature of the unable-to-agree requirement. *See id.* at 797–98. For our holding, we relied heavily on *State v. Hipp*, 832 S.W.2d 71

(Tex.App.-Austin 1992), *rev'd on other grounds sub nom State v. Dowd*, 867 S.W.2d 781 (Tex.1993). *Hubenak II*, 65 S.W.3d at 797–98. In *Hipp*, the trial court did not decide the unable-to-agree jurisdictional requirement as a preliminary matter, but submitted the issue to the jury, which failed to find that the State had negotiated in good faith. *Hipp*, 832 S.W.2d at 74. Based on the jury's findings, the trial court dismissed the condemnation suits for lack of subject-matter jurisdiction. *Id.* On appeal, the *Hipp* court held that the determination of the unable-to-agree requirement was a preliminary matter for the court, reasoning:

> If ... a factual dispute as to the fulfillment of this statutory prerequisite is a question for the jury, an entire eminent-domain proceeding would be void and the case dismissed if, at the conclusion of the trial, the jury found that the condemnor had failed to satisfy the unable-to-agree requirement.... Such a process obviously results in an enormous waste of time and money for all parties involved, including the judicial system. The purpose of requiring the condemnor to plead and prove that it made a bona fide effort to agree is to prevent needless litigation. A process that permitted a complete jury trial simply to determine if the trial court had jurisdiction over the cause would frustrate that purpose.

We conclude that the trial judge should determine as a threshold matter whether the condemnor has satisfied the unable-to-agree prerequisite to bringing suit. Such a process comports with the general rule that the determination of jurisdiction is made by the court, not the jury. A matter of first consideration by any court is the determination of its own jurisdiction. Moreover, a court has the

---

**2.** *See Hubenak III*, 141 S.W.3d at 178 n. 21.

power to determine any facts on which its jurisdiction depends. Indeed, Texas courts must often resolve factual issues in making jurisdictional determinations.... Thus, our conclusion that the judge, not the jury, should decide whether the condemnor has satisfied the statutory requirement comports with traditional Texas practice as to the determination of jurisdictional matters.

*Id.* at 75–76 (citations omitted).

Based on this reasoning, the *Hipp* court held that, although the jury had determined the unable-to-agree issue, there was "nothing in the record ... to indicate that the trial court felt bound by the jury's verdict on this issue"; the *Hipp* court thus presumed that, in dismissing the suit, the trial court had made an implied finding that paralleled the jury's verdict and reviewed that implied finding accordingly. *Id.* at 76. It was this reasoning and holding of *Hipp* that we applied to our review of the summary judgment ruling in *Hubenak II. See Hubenak II,* 65 S.W.3d at 798.

After *Hipp* and *Hubenak II* issued, however, the Texas Supreme Court held that the unable-to-agree requirement is *not* jurisdictional. *Hubenak III,* 141 S.W.3d at 183. Accordingly, the basis for our applying a legal-sufficiency review to a summary judgment ruling in *Hubenak II* no longer exists. For this reason, too, *Hubenak III* has implicitly overruled our standard-of-review holding from *Hubenak II.*

Before *Hubenak III,* the issue of which standard of review applied to a determination, rendered upon summary judgment, of the unable-to-agree requirement had been described as a "thorny" one. *See Cusack Ranch Corp. v. MidTexas Pipeline Co.,* 71 S.W.3d 395, 398 (Tex.App.-Corpus Christi 2001), *aff'd sub nom Hubenak III,* 141 S.W.3d 172 (Tex.2004); *compare Hubenak II,* 65 S.W.3d at 798 (applying legal-sufficiency standard of review to ruling on

unable-to-agree requirement, despite fact that order appealed was summary judgment ruling) *with Hubenak v. San Jacinto Gas Transmission Co.,* 37 S.W.3d 133, 135 (Tex.App.-Eastland 2001, pet. denied) (applying summary judgment standard and rejecting sufficiency standard when order appealed was summary judgment ruling concerning unable-to-agree requirement). The *Hubenak III* court cut through that Gordian knot in a way contrary to the position that Newsom takes on rehearing.

▆ In accordance with *Hubenak III,* we hold that the summary judgment standard of review applies in an appeal from an adverse condemnation ruling rendered upon motion for summary judgment. We thus overrule Newsom's rehearing argument concerning the standard of review.

### Public Use

In issue one, the District argues that the trial court erred in denying its rule–166a(c) motions for partial summary judgment in each suit because the District proved that it had satisfied all conditions entitling it to condemnation. One of those conditions was that the acquisition of Newsom's property was for a public use. In his responses to the District's summary judgment motions, Newsom argued that fact issues existed on whether (1) the takings were for a public use because the improvements benefitted only the developers' lands or (2) the District fraudulently or arbitrarily and capriciously concluded that the takings were for a public use. In his rule–166a(c) summary judgment motions, Newsom argued that he had conclusively proved that the takings were not for a public use because the improvements allegedly benefitted only the developers' lands. In issue two, the District argues that the trial court erred in granting Newsom's rule–166a(c) summary judgment motions on this ground.

## A. The District's Statutory Basis for Eminent Domain

The District is clothed with the following authority:

(a) A district shall have the functions, powers, authority, rights, and duties which will permit accomplishment of the purposes for which it was created.

(b) A district is authorized to purchase, construct, acquire, own, operate, maintain, repair, improve, or extend inside and outside its boundaries any and all works, improvements, facilities, plants, equipment, and appliances necessary to accomplish the purposes of the district authorized by the constitution, this code, or other law, including all works, improvements, facilities, plants, equipment, and appliances incident, helpful, or necessary to:

. . .

(3) gather, conduct, divert, and control local storm water or other local harmful excesses of water in a district; . . . .

TEX. WATER CODE ANN. § 54.201(a), (b)(3) (Vernon Supp.2004–2005).

The District sought to condemn Newsom's property under the following statute:

A district ... may acquire by condemnation any land, easements, or other property inside or outside the district boundaries ... *necessary for* water, sanitary sewer, storm drainage, or *flood drainage or control purposes* or for any of its projects or purposes, and may elect to condemn *either the fee simple title or a lesser property interest.*

*Id.* § 49.222(a) (Vernon 2000) (emphasis added); *see also id.* § 49.218(a)-(c) (Vernon Supp.2004–2005) (granting districts right to purchase land or interest in land considered necessary for districts' purposes).

## B. The Requirement That the Taking Be for Public Use

"The Constitution itself protects private property from any taking except for the public use...." *Borden v. Trespalacios Rice & Irrigation Co.*, 98 Tex. 494, 86 S.W. 11, 15 (1905); *see* TEX. CONST. art. I, § 17. What constitutes a public use is a question of law for the court. *Tenngasco Gas Gathering Co. v. Fischer*, 653 S.W.2d 469, 474 (Tex.App.-Corpus Christi 1983, writ ref'd n.r.e.); *Atwood v. Willacy County Navigation Dist.*, 271 S.W.2d 137, 140 (Tex.Civ.App.-San Antonio 1954, writ ref'd n.r.e.). However, "the legislative declaration that a use is public and the delegation of power of eminent domain [are] to be given great weight by the court" in determining whether a particular use is public or private. *Fischer*, 653 S.W.2d at 475; *accord Atwood*, 271 S.W.2d at 140. Put another way, the legislative declaration is binding unless the use is "clearly and palpably" private. *Hous. Auth. of the City of Dallas v. Higginbotham*, 135 Tex. 158, 143 S.W.2d 79, 83 (1940).

What is important in the public-use determination is the character of the right inuring to the public, not the extent to which the public's right is exercised. *Fischer*, 653 S.W.2d at 475. As the Texas Supreme Court has explained,

[i]t is immaterial if the use is limited to citizens of a local neighborhood, or that the number of citizens likely to avail themselves of it is inconsiderable, so long as it is open to all who choose to avail themselves of it. The mere fact that the advantage of the use inures to a particular individual or enterprise, or group thereof, will not deprive it of its public character.

*Higginbotham*, 143 S.W.2d at 84 (quoting *West v. Whitehead*, 238 S.W. 976, 978 (Tex. Civ.App.-San Antonio 1922, writ ref'd)). "Public use" has, accordingly, been defined

in various ways, one of which is that the use is public when the public obtains some definite right or use in the undertaking to which the property is devoted. *See Coastal States Gas Producing Co. v. Pate,* 158 Tex. 171, 309 S.W.2d 828, 833 (1958). The Texas Supreme Court thus construes "public use" rather liberally, although the court has rejected a definition that means nothing more than public welfare or good or under which any business that promotes the community's prosperity or comfort might be aided. *See id.*

## C. Application of the Law to the Summary Judgment Evidence

■■■ We begin by noting that the Legislature has declared that the District's purposes, for which it has been delegated the power of eminent domain, extend to conducting activities like the building of retention ponds and the expanding of drainage ditches. *See* TEX. WATER CODE ANN. § 54.201(a), (b)(3). This is a legislative determination that such projects are public uses. That declaration is binding unless the uses are "clearly and palpably" private. *See Higginbotham,* 143 S.W.2d at 83.

The District's board determined that both the ditch expansion and the retention pond were for public uses. The District presented summary judgment evidence that the expanded ditch and the pond were for the public purpose of regulating excess or flood waters. There was also evidence that any water to the north of the pond,

not just water from the Santasiero property, could drain into the pond. In response, Newsom pointed to the following evidence: (1) the District's board resolutions stated that the pond was necessary to "serve" Santasiero's property and that the expansion was necessary to widen the "Lakewood Grove ditch"; (2) the pond was of a size to handle the amount of estimated overflow from the Santasiero developments only, even though the pond could receive water from anywhere upland; and (3) the ditch was being built to facilitate HCFCD's approval of the Lakewood Grove subdivision.[3]

The Legislature has indicated that projects like these are for public purposes,[4] and the District produced evidence that both the ditch expansion and the pond construction would serve the public purpose of draining excess water from the area. That showing sufficed. It is immaterial whether the District wanted the pond and the ditch expansion to assist other developers' properties, as long as the public could benefit from or use the improvements and the improvements were not "clearly and palpably private." *See Higginbotham,* 143 S.W.2d at 83; *Pate,* 309 S.W.2d at 833.

Furthermore, with respect to the retention pond, no one disputes that water from any uphill areas could flow into it. This fact distinguishes the pond from the private roads in the cases on which Newsom relies.[5] Given that water from public ar-

---

**3.** We do not address here the remainder of Newsom's summary judgment arguments under this issue because they concerned where the projects were to be located or the need for them at all, rather than whether the projects were generally for public uses.

**4.** *See* TEX. WATER CODE ANN. § 54.201(a), (b)(3).

**5.** *See Maher v. Lasater,* 163 Tex. 356, 354 S.W.2d 923, 924, 926 (1962) (holding uncon-

stitutional statute that allowed commissioners' court to declare private road as public highway so that one landlocked individual, condemnees' neighbor, would have means of egress from his property, when subject road did not serve as means of access to any other land and no residents lived along its course); *Phillips v. Naumann,* 154 Tex. 153, 275 S.W.2d 464, 467–68 (1955) (considering private road that had been declared public to allow one landowner's ingress and egress);

eas generally can flow into the pond, it is immaterial that the pond was built in the size necessary to accommodate estimated water run-off from Santasiero's development. What is important is that water from anywhere upland could flow into the pond, not the extent to which others' water would flow there or the extent to which the pond might not, with later development in the area, suffice adequately to serve all properties. *See Higginbotham*, 143 S.W.2d at 84 ("It is immaterial if the use is limited to the citizens of a local neighborhood, or that the number of citizens likely to avail themselves of it is inconsiderable, so long as it is open to all who choose to avail themselves of it."); *Fischer*, 653 S.W.2d at 475 (explaining that character of right inuring to public, not extent to which public's right is exercised, is the important consideration).

## D. Conclusion

The District thus conclusively proved that the retention pond and the ditch expansion were for public uses. Newsom did not raise fact issues on these matters or conclusively prove that these improvements were not for public uses.

Accordingly, the trial court erred to the extent that it denied the District's motions for partial summary judgment on the ground of public use and to the extent that it granted Newsom's motions for summary judgment on the ground that no public use existed as a matter of law.

We sustain those portions of issues one and two concerning the takings' being for public uses.

### Public Necessity

Also under issue one, the District argues that the trial court erred in denying its

rule–166a(c) motions for partial summary judgment in each suit because the District proved that there was a public necessity for the acquisition of Newsom's property. In issue two, the District argues that the trial court erred in overruling its rule–166a(i) motions for partial summary judgment on Newsom's defense that the District's determinations of public necessity were arbitrary and capricious or unreasonable. In his responses to the District's summary judgment motions, Newsom argued that fact issues existed on whether the District fraudulently or arbitrarily and capriciously concluded that using his property for the projects was necessary. In his rule–166a(c) summary judgment motions, Newsom argued that he had conclusively proved the same thing. In issue two, the District argues that the trial court erred in granting Newsom's rule–166a(c) summary judgment motions on this ground.

## A. The Requirement That the Taking Be Necessary for the Declared Public Use

 The applicable eminent-domain statute requires that takings be necessary for the declared public purposes. *See* Tex. Water Code Ann. § 49.222(a) (Vernon 2000). The condemnor's discretion to determine what and how much land to condemn for its purposes—that is, to determine public necessity—is nearly absolute. *See Jones v. City of Mineola*, 203 S.W.2d 1020, 1022 (Tex. Civ.App.–Texarkana 1947, writ ref'd); *Ludewig v. Houston Pipeline Co.*, 773 S.W.2d 610, 614 (Tex.App.-Corpus Christi 1989, writ denied). Courts do not review the exercise of that discretion without a showing that the condemnor acted fraudulently, in bad faith, or arbitrarily and capriciously, *i.e.*, that the condemnor

*Tod v. Massey*, 30 S.W.2d 532, 533 (Tex.Civ. App.-Galveston 1930, no writ) (similar), *over-*

*ruled by Tarrant County v. Shannon*, 129 Tex. 264, 104 S.W.2d 4 (1937).

clearly abused its discretion. *Meaney v. Nueces County Navigation Dist. No. 1*, 222 S.W.2d 402, 405, 408 (Tex.Civ.App.-San Antonio 1949, writ ref'd); *Ludewig*, 773 S.W.2d at 614; *Bradford v. Magnolia Pipe Line Co.*, 262 S.W.2d 242, 246 (Tex.Civ. App.-Eastland 1953, no writ) (holding same even when eminent-domain statute requires finding of necessity, as does statute at issue in present case). The rationale for this rule is that, otherwise, one factfinder

> might hold on competent evidence that land in question in the suit (a constituent part of the whole of a larger amount necessary to the accomplishment of the objective of the condemning authority) was not necessary to such purposes and the accomplishments of an entire project destroyed because of the inability to obtain the small part of land which [was] made the subject of the particular condemnation suit.

*Wagoner v. City of Arlington*, 345 S.W.2d 759, 763 (Tex.Civ.App.-Fort Worth 1961, writ ref'd n.r.e.); *accord Bradford*, 262 S.W.2d at 246. The landowner has the burden to establish these defenses. *Ludewig*, 773 S.W.2d at 614; *Snellen v. Brazoria County*, 224 S.W.2d 305, 310 (Tex. Civ.App.-Galveston 1949, writ ref'd n.r.e.).

■ In the condemnation context, fraud means "any act, omission or concealment, which involved a breach of legal duty, trust or confidence, justly reposed and is injurious to another, or by which an undue and unconscientious advantage is taken of another." *Wagoner*, 345 S.W.2d at 763; *accord Boucher v. Texas Turnpike Auth.*, 317 S.W.2d 594, 601 (Tex.Civ.App.- Texarkana 1958, no writ).

■ In the same context, arbitrary and capricious, like abuse of discretion, means "willful and unreasoning action, action without consideration and in disregard of the facts and circumstances...." *Wag-*

*oner*, 345 S.W.2d at 763; *see Brazos River Conservation & Reclamation Dist. v. Harmon*, 178 S.W.2d 281, 292–93 (Tex.Civ. App.-Eastland 1944, writ ref'd w.o.m.) (explaining abuse of discretion in terms of arbitrariness, capriciousness, partiality, and the like). Therefore, when "there is room for two opinions, an action cannot be deemed arbitrary when it is exercised honestly and upon due consideration, regardless of how strongly one believes an erroneous conclusion was reached." *Ludewig*, 773 S.W.2d at 614; *see Meaney*, 222 S.W.2d at 408; *Wagoner*, 345 S.W.2d at 763, 764. Similarly, a showing that alternate plans are feasible or better does not make the condemnation determination arbitrary or capricious. *Ludewig*, 773 S.W.2d at 614; *Wagoner*, 345 S.W.2d at 763.

■ Accordingly, to show that the District acted arbitrarily and capriciously, Newsom had to negate any reasonable basis for determining what and how much land to condemn for the pond and the ditch expansion. *See Wagoner*, 345 S.W.2d at 763 (noting that non-movant landowner could "have raised the issue [of arbitrary and capricious determination of necessity] only if it was unquestionably established in the evidence that there could have been no actual public necessity for the city to seek the land in question ...."); *cf. Ludewig*, 773 S.W.2d at 614–15 (in reviewing the granting of judgment notwithstanding verdict in favor of condemnor, despite jury's answer that condemnor acted arbitrarily and capriciously in determining route and amount of land to be condemned, holding that landowners' evidence that condemnor could have adopted plans circumventing landowners' property or taking less of it was no evidence of arbitrary or capricious behavior).

One way that Newsom could negate any reasonable basis for the District's determining what and how much land to condemn—that is, one way that he could show arbitrary and capricious action by the District—was to show that the District had completely abdicated its responsibilities in determining whether, what, or how much land to condemn. Put another way, Newsom could show that the District had declined to exercise discretion that the law required it to exercise.[6] If Newsom could show that the District had failed to exercise discretion that it was required to exercise, then, necessarily, he would also have raised a fact issue regarding any bases on which the District showed that it had acted: evidence showing a failure to exercise any discretion on a given occasion counters evidence showing that discretion was actually exercised in particular ways or for particular reasons on that occasion.

On rehearing, the District argues that we have improperly "imposed an added level of scrutiny" to the review of condemnation decisions by having recognized a failure-to-exercise-discretion means of showing arbitrary and capricious action. Specifically, the District argues that (1) abuse of discretion in the context of condemnation proceedings differs from abuse of discretion in other contexts, given that, in the former, a landowner must negate any reasonable bases for the condemning authority's action and, thus, (2) the non-condemnation authority on which we rely for our challenged holding does not apply in this case. We disagree.

First, it is not unusual in administrative law to label as arbitrary and capricious an agency's failure to exercise discretion that it is required to exercise.[7] Second, in administrative law, the concept of arbitrary and capricious agency action is sometimes explained in terms of an agency's abuse of

**6.** *Cf.* W. Wendell Hall, *Standards of Review in Texas*, 34 St. Mary's L.J. 1, 15–16 (2002) (citing *Landon v. Jean–Paul Budinger, Inc.*, 724 S.W.2d 931, 938–40 (Tex.App.-Austin 1987, no writ), and other cases for proposition that trial court abuses discretion, for example, by declining to exercise discretionary power vested in court by law when circumstances require that power be exercised or by purporting to exercise discretion without sufficient information upon which rational decision may be made); *cf. also Womack v. Berry*, 156 Tex. 44, 291 S.W.2d 677, 682 (1956) ("It is well settled that mandamus lies ... to require the exercise of discretion."); *Starr County v. Starr Indus. Servs., Inc.*, 584 S.W.2d 352, 355–56 (Tex.Civ.App.-Austin 1979, writ ref'd n.r.e.) ("In determining whether an agency has acted arbitrarily or capriciously ... the reviewing court must remand '... if it concludes that the agency has not actually taken a hard look at the salient problems and has not genuinely engaged in reasoned decision-making.'") (citations omitted).

**7.** *See, e.g.,* Charles H. Koch Jr., 3 Administrative Law & Prac. § 10.6[3] (2nd ed. 1997) ("Failure to exercise discretion might be an abuse of discretion."); 73A C.J.S. *Pub. Ad-*

*min. Law & Proc.* § 416 (2004) ("An agency that has authority to act but fails to exercise that authority based upon a false belief that there is no such authority abuses its discretion."); 1A Am.Jur. Pl. & Pr. Forms *Administrative Law* § 194 (2003) ("The courts may not invade the field of discretion conferred by law on an administrative agency. The courts, however, are not precluded from holding ... that (subject to limitations) there has been a failure to exercise discretion...."); 8 Mich Pl. & Prac. § 60:162 (2nd ed.) ("[T]he court may not examine or review the exercise of official discretion by the agency ... in the absence of a showing of abuse of discretion, or failure to exercise a legal discretion...."); 9 Witkin, Cal. Proc. 4th § 114 (Supp.2004) (citing *Grimes v. State Dep't of Soc. Servs.*, 70 Cal.App.4th 1065, 83 Cal.Rptr.2d 203, 208 (1999), for proposition that "abuse of discretion will be found where agency ... fails to exercise discretion ...."); *see also* 2 Am.Jur. 2d *Administrative Law* § 498 (May 2004) ("The [arbitrary-and-capricious] standard is also appropriate to review decisions not to take action.").

discretion.[8] Accordingly, authority concerning the general standard for abuse of discretion outside the realm of administrative law can be instructive in the administrative-law context under appropriate circumstances. Third, the *Landon* opinion—on which we rely and which the District claims does not apply because *Landon* concerned review of a judicial decision—itself analogized review for arbitrary and capricious agency action to review for abuse of discretion in judicial decisions. *See Landon*, 724 S.W.2d at 935.[9] Finally, as a matter of logic, evidence showing a complete failure to exercise discretion in taking an action also negates any reasonable basis for the agency's action. For these reasons, we reject this rehearing argument of the District.[10]

**8.** *See, e.g., Gerst v. Nixon*, 411 S.W.2d 350, 361 n. 8 (Tex.1966) (" 'In order to give a reasonable meaning to section 10(e) (of the Administrative Procedure Act, 15 U.S.C. § 1009), and in light of legislative reluctance to exclude judicial review, the most rational construction of section 10(a) would seem to be that once a question has been commitment [sic] to agency discretion, the only ground for reversal would be an agency decision which is 'arbitrary,' or in other words, an abuse of discretion.' ") (quoting 115 U. OF PA. L.REV. 40 (1966)); *Landon*, 724 S.W.2d at 935 ("In a similar way, an administrative agency's choice in a contested case is protected from reversal on judicial review by the 'abuse of discretion' standard set forth in [a former version of the Texas Administrative Procedure Act], where it is coupled with the analogous expressions 'arbitrary or capricious' and 'clearly unwarranted exercise of discretion.' "); *Consumers Water, Inc. v. Pub. Util. Comm'n of Tex.*, 774 S.W.2d 719, 721 (Tex. App.-Austin 1989, no writ) ("In determining whether an agency act or omission is arbitrary and capricious, a reviewing court must ascertain whether the agency abused its discretion ...."); *cf.* TEX. GOV'T CODE ANN. § 2001.174(2)(F) (Vernon 2000) ("If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but: ... shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: ... arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.").

**9.** The *Landon* court stated:

[T]he word "discretion" signifies a power to choose among alternatives within legal bounds. This power is routinely given to government officials because government cannot be conducted without the exercise by someone of the power to choose with authority, that is to say, the power to determine, according to the official's best judgment, what alternative is best in the circumstances. The "discretion" contemplated by the "abuse of discretion" standard is similar in that it signifies the power legally committed to a trial court to choose among alternatives: whether to issue a temporary injunction, whether to set aside a default judgment, whether to sustain a pleader's special exception, and so forth.... In a similar way, an administrative agency's choice in a contested case is protected from reversal on judicial review by the "abuse of discretion" standard set forth in [a former version of the Texas Administrative Procedure Act], where it is coupled with the analogous expressions "arbitrary or capricious" and "clearly unwarranted exercise of discretion." ...

It is fundamental, however, that neither a trial court nor an administrator may exercise authoritatively a power that is not vested in him by law....

*Id.* at 935.

**10.** We distinguish the authority on which the District relies because in none of those cases did the condemnor abdicate control to a private party alleged to have interests adverse to those of the landowner, when there was also an allegation that the condemnor did not exercise any independent consideration of necessity. *See Anderson v. Teco Pipeline Co.*, 985 S.W.2d 559, 566 (Tex.App.-San Antonio 1998, pet. denied) (holding that condemnor's not doing surveys before determining pipeline route, but instead merely following routes of existing pipelines, was not evidence of arbi-

## B. Application of the Law to the Summary Judgment Evidence

### 1. The District's Evidence

■ Regarding the pond, a land planner testified for the District that, as HCFCD had concluded, a pond was necessary. Santasiero's engineer, Newsom's engineer, and Newsom's land planner agreed that a retention pond was necessary, but did not specify a location. HCFCD did not require that the pond be placed on Newsom's property, but Ray Zobel, president of the District's board, testified that the board selected Newsom's property for the pond because that location would have allowed Villagio to have more homes, thus increasing the tax base more than if Newsom had been allowed to develop his own land.

Regarding the ditch expansion, an engineer and a land planner testified for the District that, as HCFCD had concluded, the project was necessary. Newsom's own land planner agreed that HCFCD "would prudently require" the ditch expansion. The existing ditch ran along the eastern boundary of Newsom's northern tract of land. The only direction in which the ditch could be expanded was westward, onto Newsom's property, because the land to the east of the ditch had already been developed.

### 2. Newsom's Evidence

Regarding the pond, it was undisputed that HCFCD did not care where the pond was placed, and none of HCFCD's regulations required that the pond be placed on Newsom's property. Rather, HCFCD recognized that the pond could have been placed on Santasiero's property, on Newsom's property, or in a downland location on neither's property. For this reason, HCFCD did not tell anyone with the District that Newsom's land had to be condemned for the pond. Santasiero's engineer also concluded that the pond could be placed in any of those three places, although he was not asked to assess which location was best. Nonetheless, the District's offer letter to Newsom stated that HCFCD required the taking specifically of his property for the pond, although board president Zobel later admitted that HCFCD required only a pond, not the placement of that pond on Newsom's property.

The District's summary judgment evidence showed that the board chose Newsom's land for the pond because doing so would increase the tax base more than if Newsom had been allowed to keep his land and develop it himself. However, board president Zobel admitted that the District did not have its engineer confirm Santasiero's claim that it would be more profitable for the District to place the pond on Newsom's property, *i.e.*, that developing Villagio would increase the tax base more than developing Newsom's land. Rather, the District evidently took Santasiero's word as true, even though his interest was adverse to Newsom's. In fact, it was Santasiero who chose the

---

trary and capricious action when, "for economic reasons, [the condemnor] attempted to follow the straightest route possible between the two points."); *Houston Lighting & Power Co. v. Fisher*, 559 S.W.2d 682, 685–86 (Tex. Civ.App.-Houston [14th Dist.] 1977, writ ref'd n.r.e.) (holding that landowners' summary judgment was properly denied on ground that condemnor's board had not made proper determination by resolution of public necessity

and convenience: overall larger project, of which taking at issue was only small part, had been "the subject of several years of studies" and had been found necessary by resolution, even if board had not been advised of details relating to taking smaller portion at issue in case); *Bolin v. Brazoria County*, 381 S.W.2d 206, 209 (Tex.Civ.App.-Houston 1964, no writ).

pond's location. Likewise, the District did not ask its own engineer to evaluate the need for this condemnation, even though the District would have looked to its engineer to advise it whether to condemn this land. Additionally, board president Zobel admitted that he was not advised that Santasiero's engineer had identified alternative locations for the pond. Zobel also testified that he had "no idea" why the board took Newsom's land in fee simple, rather than in easement.

Regarding the ditch expansion, Newsom produced evidence that the District did not consider or investigate the scope of the taking. For example, HCFCD did not require that the rights-of-way for drainage ditches such as this be taken in fee simple, but instead required only easements. HCFCD would have approved Villagio's expansion had only an easement been taken there. Nonetheless, the District sought to condemn Newsom's land in fee simple, even though the sole alleged basis for the taking was that HCFCD required the ditch expansion, and despite the fact that HCFCD never required a taking in fee. In fact, board president Zobel could not recall that anyone had consulted the board on why Newsom's land was being taken in fee, rather than in easement, and Zobel himself did not know the difference between a fee interest and an easement.

Viewing the evidence in the light most favorable to Newsom and taking all rea-sonable inferences in his favor, for purposes of the District's motions for partial summary judgment, we hold that the above evidence raises a fact issue on whether the District declined to exercise its discretion in determining whose land to condemn for the pond and in deciding whether to condemn Newsom's land in easement or in fee for the ditch expansion. That is, the evidence raised a fact issue on whether the District reached its condemnation decisions arbitrarily and capriciously or by abusing its discretion. *Cf. Landon,* 724 S.W.2d at 938–40. We also hold that, viewing the evidence in the light most favorable to the District and taking all reasonable inferences in its favor, for purposes of Newsom's motions for summary judgment, Newsom did not conclusively prove that the District acted arbitrarily and capriciously in determining necessity.

■■■ Further evidence regarding both tracts of land raises a fact issue, as well. The District signed agreements with both Santasiero and Garrett (the "condemnation agreements") soon after it voted to condemn Newsom's property. In the condemnation agreements, the developers agreed to pay all costs of condemnation, including attorney's, expert, and appraisal fees. If the condemnation succeeded, and if bonds were passed and approved, the District agreed to reimburse the developers pursuant to previously-executed pre-funding agreements [11] with the same de-

---

11. A "prefunding agreement" allows a developer to proceed with preparations for and construction of various facilities—such as those for water, sanitary sewage, drainage, retention, and recreation—while waiting for a condemning entity to issue and to get approval on bonds to acquire the facilities and to reimburse the developer for related costs and expenses. The developer builds in advance at its own risk: if the condemning entity cannot issue bonds or get approval, if the developer constructs the project contrary to regulation or agreement, or under like circumstances, the developer generally will not be reimbursed. The rules of the Texas Commission on Environmental Quality ("TCEQ") (formerly known as the Texas Natural Resource and Conservation Commission), which rules govern the pond and ditch projects and the condemnation proceedings here, expressly allow for prefunding agreements for the financing and construction of water, wastewater, drainage, and recreational facilities under certain conditions. *See* 30 TEX. ADMIN. CODE §§ 293.46, 293.47, 293.50 (2002) (Tex.

velopers. The condemnation agreements further provided as follows: "If the condemnation of the above referenced tract is held to be invalid either judicially or otherwise, you will not be reimbursed by the District for any of the costs associated with the condemnation." The developers also agreed to furnish the following items, among others, to the District: a legal description of the sought-after property, plans and specifications for the pond and the ditch enlargement, and an appraisal of the sought-after land.

The condemnation agreements were separate contracts from the prefunding agreements. The condemnation agreements paralleled the earlier prefunding agreements in that the condemnation agreements required the developers to front all costs of condemnation and allowed for reimbursement "pursuant to the Prefunding Agreement[s]" if condemnation was completed and bonds were sold and approved. The condemnation agreements differed from the earlier prefunding agreements, however, in that the condemnation agreements essentially indemnified the District for any costs should condemnation fail for any reason.

The District argues that the condemnation agreements were merely prefunding agreements, the use of which is common and legal. Newsom does not contest the validity of prefunding agreements generally. Rather, Newsom's position is that the condemnation agreements *exceeded* mere prefunding agreements to the extent that they provided that the District would not have to reimburse the developers if the condemnation proceedings were unsuccessful for any reason—allegedly taking away the District's statutory disincentive to condemn property improperly or without adequate investigation. Additionally, Newsom points to the fact that the condemnation agreements made the competing developers solely responsible for determining the appraised value and the parameters of the land to be taken. He argues that this provision supports his theory that the District abdicated its duty to determine whether and what to condemn.

Without deciding the legality or propriety of this type of agreement generally,[12]

---

Comm'n on Envtl. Quality). The summary judgment evidence showed that it is common and accepted practice for developers to prefund projects such as the building of water, sewage, drainage, and recreational facilities until the water district can reimburse the developers through bond funds.

12. The applicable regulations and statutes do not expressly mention condemnation agreements. For example, the TCEQ regulations allowing developers to prefund the financing and construction of water, wastewater, drainage, and recreational facilities do not expressly mention prefunding of costs and fees related to condemnation. *See* 30 TEX. ADMIN. CODE §§ 293.46, 293.47, 293.50 (2002). Similarly, the TCEQ regulations governing water districts' land and easement acquisition do not mention a developer's ability to prefund costs associated with acquiring another's property. *See id.* § 293.51 (2002) (providing that *district*

may pay expenses and costs related to land and easement purchases). That said, as the District argues, nothing in the TCEQ regulations or the Water Code expressly disallows this type of agreement, and the Code does allow water districts to use their funds for reimbursement generally. *See* TEX. WATER CODE ANN. § 49.155(a)(5), (9), (12), (13), (14) (Vernon Supp.2004–2005) (allowing bond funds to be expended on district's expenses, including professional fees, surveys, costs during construction periods, investigation and planning costs, and "land required for stormwater control"); *id.* § 49.155(c) (allowing reimbursement for money advanced for purposes stated in section (a)); *see also id.* § 49.213(a)-(c) (Vernon 2000) (allowing district to enter into contracts in performing duties, including for development of land and property within district through purchase, construction, or installation of works, improvements, facilities, plants, equipment, and

we note that the condemnation agreements here relieved the District of certain statutory burdens that are intended as safeguards for landowners. Those safeguards are found in Property Code section 21.019. *See* TEX. PROP.CODE ANN. § 21.019. Section 21.019 either requires or allows the trial court to award the landowner its "reasonable and necessary fees for attorneys, appraisers, and photographers and for the other expenses incurred by the property owner" through the time of dismissal or judgment when a condemnation is voluntarily or involuntarily dismissed or when the trial court denies the right to condemn. *See id.* § 21.019(b), (c). The effect of section 21.019(c), which applies here because it applies when the trial court grants the landowner's motion to dismiss or otherwise denies condemnation, is to allow the trial court to make landowner whole if he prevails and to discourage the condemnor from seeking condemnation unfairly or irresponsibly. *Cf. State v. Tamminga,* 928 S.W.2d 737, 740 (Tex.App.-Waco 1996, no writ) (holding that purpose of section 21.019(b), concerning voluntary dismissal, is to reimburse landowner for expenses incurred in abandoned condemnation proceeding and "to discourage the commencement and subsequent abandonment of condemnation proceedings"); *Brazos County Water Control & Improvement Dist. No. 1 v. Salvaggio,* 698 S.W.2d 173, 176 (Tex.

App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.) (noting that enactment of predecessor to section 21.019(b) in 1969 "indicate[d] the legislature's intent to require condemnors to act more responsibly and fairly toward landowners").

Viewed in the appropriate light, the condemnation agreements at issue here removed that disincentive by, in effect, indemnifying the District for any costs or fees associated with the condemnation proceedings, regardless of whether the District acted arbitrarily, capriciously, or fraudulently. In light of Newsom's other evidence, from which one could reasonably infer that the District abdicated its discretion in deciding what land to condemn for the pond and whether to condemn Newsom's land in easement or in fee for the ditch expansion, the condemnation agreements raised an inference that the District abdicated its discretion because it knew that it would not have to pay should condemnation fail for whatever reason—including, for example, because the District's decisions to condemn were later found to be arbitrary or capricious.

**C. Conclusion**

We hold that Newsom raised a fact issue on whether the District abdicated its discretion to determine whether and how much to condemn, *i.e.,* that the District

appliances). We have found only one Texas opinion discussing an agreement with a provision like one in the condemnation agreements here, but that opinion did little more than recognize the agreement's existence and did not consider the agreement's effect relevant to the showing of necessity for a taking. *See Hardwicke v. City of Lubbock,* 150 S.W.3d 708, 712 (Tex.App.-Amarillo 2004, no pet.) (noting that city and developers had entered into agreement that developer would reimburse city for condemnation cost, including attorney's fees).

The District argues that the condemnation agreements here cannot raise a fact issue in

Newsom's favor unless they are illegal, which it claims that they are not under the above authority. We disagree that the condemnation agreements have to be illegal to raise a fact issue in Newsom's favor, and we accordingly decline to rule on the condemnation agreements' legality or propriety. We simply note that the condemnation agreements, when viewed in the required light, and when considered with the other evidence that Newsom adduced, raise a fact issue on whether the District arbitrarily and capriciously determined that the takings were necessary.

acted arbitrarily and capriciously. *Cf. Landon,* 724 S.W.2d at 938–40. Therefore, the trial court did not err to the extent that it denied the District's rule–166a(c) and rule–166a(i) motions for partial summary judgment on the grounds of the District's determination of public necessity or on Newsom's defenses to that determination. However, we further hold that Newsom did not prove conclusively his entitlement to summary judgment on his defenses to the District's determination of public necessity. Therefore, the trial court erred to the extent that it granted summary judgment for Newsom on this ground.

Accordingly, we overrule that portion of issue one and sustain the corresponding portion of issue two concerning the necessity for taking Newsom's land.

### Unable–to–Agree Requirement

In issue one, the District argues that the trial court erred in denying its rule–166a(c) motions for partial summary judgment on the ground that the District proved that it had fulfilled the unable-to-agree requirement by having made a good-faith offer of damages, which Newsom rejected, before suit. Newsom's summary judgment responses argued that fact issues precluded the granting of summary judgment on this ground. He later moved for rule–166a(c) summary judgment on the ground that he had conclusively negated the existence of good-faith offers of damages and, thus, had also negated the fulfillment of the unable-to-agree requirement. In issue two, the District argues that the trial court erred in granting Newsom's rule–166a(c) summary judgment motions on this ground.

### A. The Law

■■■ The District had the burden to plead and to prove that, before it filed the condemnation proceeding, it was unable to agree with Newsom on the amount of damages that would result from the taking. *See Hubenak II,* 65 S.W.3d at 796; Tex. Prop.Code Ann. § 21.012(a), (b)(4) (allowing condemnor that is "unable to agree" with the landowner on amount of damages to begin condemnation proceeding and requiring petition to allege same). A condemnor is generally not required to continue to attempt negotiations when further attempts appear futile. *Id.*

Before *Hubenak III,* our Court (along with other courts of appeals) had held that "[t]he 'unable-to-agree' condition refers to a bona fide attempt to agree on damages and includes a bona fide offer by the condemnor to pay the estimated true value of land." *Hubenak II,* 65 S.W.3d at 797; *see Hipp,* 832 S.W.2d at 77. The courts adopting this standard had generally held that a bona fide offer is one that is

> made "[i]n or with good faith; honestly, openly, and sincerely; without deceit or fraud." In the context of eminent domain proceedings, the offer must not be arbitrary and capricious; rather, it must be based on a reasonably thorough investigation and honest assessment of the amount of just compensation due the landowner as a result of the taking.

*Hipp,* 832 S.W.2d at 78 (citations omitted); *accord Hubenak II,* 65 S.W.3d at 798. This "good faith" standard was subjective. We applied this subjective standard on original submission in this case and, under that standard, held that a fact issue existed on whether the District had made a good-faith offer for damages.

■■■ However, after our opinion issued, and during the pendency of rehearing, the Texas Supreme Court issued its opinion in *Hubenak III,* on which the District relies by post-submission brief. The *Hubenak III* court rejected a good-faith, subjective analysis in determining whether the unable-to-agree requirement is met, disap-

proving of any courts-of-appeals opinions to the contrary. *Hubenak III,* 141 S.W.3d at 186–87. The *Hubenak III* court reasoned that (1) despite applying a good-faith standard, most courts of appeals had required minimal evidence anyway to satisfy the unable-to-agree requirement; (2) the statutory condemnation scheme does not contemplate scrutiny of the offer's dollar amount—which in most cases will be the measure of whether an offer was made in good faith—at the preliminary point at which the court considers the unable-to-agree issue because such an inquiry would be duplicative of the later determination of damages; and (3) the statutory scheme does not contemplate subjective inquiry into good faith because the purpose of the unable-to-agree requirement is simply to forestall litigation and to prevent needless appeals. *Id.* Simply put, the *Hubenak III* opinion clarified that subjective, good-faith analysis is irrelevant to evaluating the unable-to-agree requirement in condemnation cases.

## B. Application of the Law to the Summary Judgment Evidence

 The District points to the following summary judgment evidence that it produced below: (1) the appraiser based his valuation of $19,000 per acre ($49,020 and $49,738 for the land for the pond and for the ditch, respectively) in part on recent sales of local property lacking utilities, which Newsom's property also lacked; (2) the District offered these amounts to Newsom and even increased the offer in an unspecified amount for the land for the pond; (3) Newsom rejected the offers, demanding $43,560 per acre for the land for the ditch, requiring a commitment that his entire property would be annexed and serviced by the District and would be able to drain into the ditch, and rejecting altogether the placement of a pond on his property; and (4) Newsom's appraiser, David Bolton, concluded that both tracts would have an unspecified lower value than the value that the tracts were given in Bolton's appraisal if they could not get access to utilities.[13] Under *Hubenak III,* this sufficed to carry the District's burden to show that the parties were unable to agree on damages. *See Hubenak III,* 141 S.W.3d at 187 ("The condemnors have established that they made offers to each of the landowners before filing condemnation proceedings. Those offers were rejected or ignored by the landowners. That is enough to satisfy section 21.012's requirement that the parties were 'unable to agree.' "); *see also Hardwicke,* 150 S.W.3d at 715 (holding that trial court did not err, based on *Hubenak III,* if it concluded that condemnor had satisfied unable-to-agree requirement because condemnor had sent offer letters to landowner, despite landowner's argument that condemnor had left all "negotiations to developer" to conduct).

In response, Newsom produced summary judgment evidence relating to whether the District's offer was made in good faith.[14] Under *Hubenak III,* that

13. Regarding the last piece of evidence, the District claims that Bolton testified that Newsom's property would not be worth the amount *offered by the District* unless the property were annexed and furnished utilities, but this was not Bolton's testimony.

14. For example, Newsom presented evidence that the condemnation agreements required the developers to furnish, among other things, an appraisal of the sought-after property.

The appraiser for both tracts of Newsom's property was recommended for the job by Garrett's lender and by the attorney for the Santasiero developments. The appraiser had previously appraised the Lakewood Grove subdivision and one other subdivision for Garrett's lender. The appraiser conferred with Santasiero and Garrett in preparing the appraisals of Newsom's land, including receiving data about lot sales, "velocity," prices,

evidence is irrelevant to the unable-to-agree inquiry. *See id.*, 141 S.W.3d at 186–87.

## C. Conclusion

We hold that the trial court erred in denying the District's rule–166a(c) motions for partial summary judgment because the District conclusively proved that the parties were unable to agree on damages before suit's filing. We further hold that the trial court erred to the extent that it granted Newsom's rule–166a(c) summary judgment motions on the ground that he conclusively proved that the District did not show that the parties were unable to agree on damages.

Accordingly, we sustain both the portion of issue one and the corresponding portion of issue two concerning the unable-to-agree requirement.

### Improper Delegation

▬ In issue two, the District argues that the trial court erred in granting Newsom's rule–166a(c) summary judgment motions on the ground that the District improperly delegated its eminent-domain powers to the competing developers.

Newsom's argument below was that the District "improperly delegated its legislative and discretionary authority to the Developers and essentially abdicated its power of eminent domain to these Developers and thus deprived Mr. Newsom of the necessary constitutional and statutory safeguards ordinarily guaranteed potential condemnees." The facts on which he relied in support were essentially those on which he relied in his other summary judgment grounds. Newsom also argued that the District "sold" its eminent-domain powers by entering into the condemnation agreements. These arguments are merely other ways of alleging that the District determined where, what, and how much to condemn by fraudulent or arbitrary means. We have already held that fact issues precluded summary judgment on those defenses.

Newsom relied on the test set out in *Proctor v. Andrews*, a case in which the plaintiffs alleged that a *statute* improperly delegated *legislative authority* to private entities. 972 S.W.2d 729, 732, 734–35 (Tex.1998). As the District points out in its reply brief, no such statute or rule delegated legislative authority to the developers here, and *Proctor's* non-delegation paradigm simply does not fit under the facts of this case. Here, the District exercised the power of condemnation, albeit, Newsom alleges, in collusion with the developers. And whether the District colluded or acted improperly with local developers, as Newsom alleges, is a matter that relates to fraud or arbitrariness in the District's condemnation decision, rather than a matter showing that the District

and "so forth" in the area from the developers. At the District's attorneys' instructions, the appraiser sent a copy of his appraisal reports to both developers on August 27, 1997. However, the District's board did not authorize the appraisals until five days later. The District's offers to Newsom were based on these appraisals. After Newsom rejected the District's offers and had counter-offered on the land for the ditch, the District's attorneys sent notice of Newsom's counter-offer to the developers, but did not present the counter-offer to the District's board or even inform board president Zobel of the counter-offer. Zobel agreed "in retrospect" that it "might" be "fundamentally unfair" for the developers to select the appraiser when the developers were paying for the condemnations that enabled them not to use their land for the required improvements. Newsom also notes that, because of the condemnation agreements, the District was shielded from condemnation costs if its suits were dismissed for any reason, even for arbitrary and capricious decisions or decisions made in bad faith.

improperly delegated the power to condemn altogether.

Accordingly, we hold that the trial court erred to the extent that it granted Newsom's rule–166a(c) summary judgment motions on this ground. We thus sustain that portion of issue two concerning improper delegation.

### Equal Protection and Due Process

In issue two, the District argues that the trial court erred in granting Newsom's rule–166a(c) summary judgment motions on the ground that the exercise of eminent domain to take his property for the developers' benefit violated due process and equal protection. *See Saunders v. Titus County Fresh Water Supply Dist. No. 1*, 847 S.W.2d 424, 427 (Tex.App.-Texarkana 1993, no writ) (noting that condemnation of property for non-public use may violate due process); *King v. Harris County Flood Control Dist.*, 210 S.W.2d 438, 440 (Tex.Civ.App.-Galveston 1948, writ ref'd n.r.e.) (same). In support of this ground, Newsom relied on the same facts on which he relied in his other summary judgment grounds. Because we have held that Newsom did not prove as a matter of law any of his other challenges to the condemnation, we hold that he did not prove this summary judgment ground conclusively, either. Therefore, the trial court could not properly have rendered summary judgment for Newsom on this ground.

Accordingly, we hold that the trial court erred in granting Newsom's rule–166a(c) summary judgment motions on this ground. We thus sustain that portion of issue two concerning equal protection and due process.

### Newsom's Additional Rehearing Argument

In his rehearing motion, Newsom argues for the first time that the District improperly sought to condemn a fee-simple interest, rather than an easement, because the Property Code allegedly creates a presumption against a taking in fee simple and because the District's board resolution did not recite that it intended to take a fee-simple interest. Because Newsom did not raise this argument on original submission, but could have, we decline to reach it. *See McGuire v. Fed. Deposit Ins. Corp.*, 561 S.W.2d 213, 216 (Tex.Civ.App.-Houston [1st Dist.] 1977, no writ) (op. on reh'g) (holding that party generally may not raise for the first time on rehearing new matters that could have been raised earlier); *Trice Prod. Co. v. Dutton Drilling Co.*, 333 S.W.2d 607, 617 (Tex.Civ.App.-Houston 1960, writ ref'd n.r.e.) (op. on reh'g) (same). Additionally, it does not appear that Newsom preserved this challenge below by raising it in his summary judgment motions or responses.[15] *See McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341, 343 (Tex.1993).

### Conclusions Concerning Summary Judgment

We hold as follows:
● The trial court erred in granting Newsom's rule–166a(c) summary judgment motions in all respects.
● The trial court erred in denying the District's rule–166a(c) motions for partial summary judgment on the

15. Newsom's summary judgment motions included a short statement that "[t]he [District's] action authorizing condemnation does not specifically authorize taking Newsom's property in fee simple." However, that statement was made in support of the ground that "[t]he condemnors improperly influenced the determination of what to condemn" and did not include any argument like that now raised on rehearing.

ground that the condemnations were for public uses.

● The trial court did not err in denying the District's rule–166a(i) motions for partial summary judgment on Newsom's defense of fraud, bad faith, and arbitrariness to the District's determination of public necessity.

● The trial court did not err in denying the District's rule–166a(c) motions for partial summary judgment on the ground that the takings were public necessities.

● The trial court erred in denying the District's rule–166a(c) motions for partial summary judgment on the ground that the parties were unable to agree, before the District initiated condemnation proceedings, on the damages to be awarded Newsom for the taking.

## The District's Supplemental Issues

By supplemental brief, the District challenges the trial court's final judgment in the following respects: (1) the trial court erred in awarding Newsom contingent appellate attorney's fees because the Property Code allows the award of attorney's fees only through judgment and (2) the trial court erred in awarding Newsom the improvements made by the District during its temporary possession of his property because the trial court dismissed the suit

for want of jurisdiction, which disposition allegedly precludes awarding possession.

Given that we reverse the final judgments, we need not reach the District's supplemental issues.

## Conclusion

We reverse the judgments and remand the causes.[16]

Justice KEYES, dissenting.

EVELYN V. KEYES, Justice, dissenting.

I agree with the majority that *Hubenak II* requires us to apply the summary judgment standard of review to the trial court's rulings on each of the statutory requirements for condemnation, including the unable-to-agree requirement. Applying this standard, I agree with the majority that the District conclusively proved that the parties were unable to agree on damages before the filing of suit. I also agree that the District carried its constitutional burden of proving that the taking was for a public use. *See* Tex. Water Code Ann. § 54.201(a), (b)(3) (Vernon Supp.2004–2005) (delegating to utility districts power of eminent domain to "gather, conduct, divert, and control local storm water or other local harmful excesses of water"); *Housing Auth. of the City of Dallas v. Higginbotham*, 135 Tex. 158, 143 S.W.2d 79, 83 (1940) (legislative determination that

---

**16.** The District raises one more challenge that we overrule as immaterial. The trial court sustained Newsom's objections to an affidavit, offered by the District in support of its motions for partial summary judgment, of James Bonham, an attorney who had represented other utility districts. The District notes that other summary judgment evidence set out the essential points that Bonham made in his affidavit, "probably" making Bonham's affidavit "not critical." However, in the event that we were to determine that Bonham's affidavit contained material and unique testi-

mony, the District conditionally challenged the exclusion of that affidavit under issue three. We have reviewed Bonham's affidavit, and we agree that it contains nothing relevant that is not also contained in or that cannot be inferred from other summary judgment evidence. Additionally, to the extent that Bonham's affidavit recites the law applicable to condemnation proceedings and eminent domain, the affidavit states nothing that, as the District acknowledges, this Court cannot determine by itself. Accordingly, we overrule issue three.

project is for public use is binding unless use is "clearly and palpably" private). However, because I believe the majority has imposed an improperly high standard of review on a utility district's determination of the necessity of a taking for public use, and has therefore denied the District judgment to which it is entitled in law, I respectfully dissent.

As the majority states, a condemning authority's discretion to condemn land for a public purpose is nearly absolute, and the courts will not review the exercise of that authority without a showing that the condemnor acted fraudulently, in bad faith, or arbitrarily and capriciously. *See Ludewig v. Houston Pipeline Co.*, 773 S.W.2d 610, 614 (Tex.App.-Corpus Christi 1989, writ denied); *Bradford v. Magnolia Pipe Line Co.*, 262 S.W.2d 242, 246 (Tex.Civ. App.-Eastland 1953, no writ); *Meaney v. Nueces County Navigation Dist. No. 1*, 222 S.W.2d 402, 405 (Tex.Civ.App.-San Antonio 1949, writ ref'd); *Jones v. City of Mineola*, 203 S.W.2d 1020, 1022 (Tex.Civ. App.-Texarkana 1947, writ ref'd). A condemnation determination is arbitrary and capricious when it is "willful and unreasoning action, action without consideration and in disregard of the facts or circumstances [that] existed at the time condemnation was decided upon, or within the foreseeable future." *Wagoner v. City of Arlington*, 345 S.W.2d 759, 763 (Tex.Civ. App.-Fort Worth 1961, writ ref'd n.r.e.). Thus, to resist summary judgment, Newsom, as condemnee, had the burden to establish that the condemnation of his property was not for an authorized public use or was willful and unreasoning and made in disregard of the facts. As the majority puts it, "[T]o show that the District acted arbitrarily and capriciously, Newsom had to negate any reasonable basis for determining what and how much land to condemn for the pond and the ditch expansion." *Malcomson Rd. Util.*

*Dist. v. Newsom*, 171 S.W.3d 257, 269 (Tex.App.-Houston [1st Dist.] 2005, no pet. h.); *see Wagoner*, 345 S.W.2d at 763 (noting that non-movant landowner could "have raised the issue [of arbitrariness] only if it was *unquestionably established* in the evidence that there could have been *no actual public necessity* for the [condemning authority] to seek the land in question for [authorized public] purposes") (emphasis added).

The majority acknowledges that

[r]egarding the pond, a land planner testified for the District that, as HCFCD had concluded, a pond was necessary. Santasiero's engineer, Newsom's engineer, and Newsom's land planner agreed that a detention pond was necessary, but did not specify a location. HCFCD did not require that the pond be placed on Newsom's property, but Ray Zobel, president of the District's board, testified that the board selected Newsom's property for the pond because that location would have allowed Villagio to have more homes, thus increasing the tax base more than if Newsom had been allowed to develop his own land.

Regarding the ditch expansion, an engineer and a land planner testified for the District that, as HCFCD had concluded, the project was necessary. Newsom's own land planner agreed that HCFCD "would prudently require" the ditch expansion. The existing ditch ran along the eastern boundary of Newsom's northern tract of land. The only direction in which the ditch could be expanded was westward, onto Newsom's property, because the land to the east of the ditch had already been developed.

*Malcomson*, 171 S.W.3d at 272. The District thus presented evidence both that there was an actual necessity for the condemnation of Newsom's land for an au-

thorized public use and that there was a reasonable basis for condemning the land. Newsom produced no evidence that showed this testimony to be fraudulent or given in bad faith.

The majority, however, places a burden on the District to go behind the evidence showing public necessity and a reasonable basis for the condemnation decision, to refuse to accept the testimony of persons whose interests are adverse to the landowner as sufficient, and to require its own engineers to confirm not just the necessity for the taking—here for the ditch and the pond—but also the necessity of condemning *this* ditch and *this* pond as opposed to any other. In addition, the majority imposes the burden on the District to consider and investigate the scope of the taking, specifically to investigate whether the right-of-way for a drainage ditch such be taken in fee simple or by easement. The majority concludes that "the above evidence raises a fact issue on whether the District declined to exercise its discretion in determining whose land to condemn for the pond and in deciding whether to condemn Newsom's land in easement or in fee for the ditch expansion," thus raising a fact issue "on whether the District reached its condemnation decisions arbitrarily and capriciously or by abusing its discretion." *Malcomson,* 171 S.W.3d at 273. I cannot agree.

First, the majority's conclusion is not supported by the language of the governing statute. There is no requirement in the governing statute, section 49.222(a) of the Water Code, that the District determine *whose* land to condemn-only that it determine on an evidentiary basis that the condemnation is for a public purpose. *See* TEX. WATER CODE ANN. § 49.222(a) (Vernon 2000). Nor is there any requirement that the condemnor investigate whether to condemn land in easement or in fee and pro-

vide evidence for its determination; rather, the power to *elect* to condemn either in fee simple or in easement is expressly given to the condemning authority. *See id.* In both cases, the language of the statute under which the District sought to condemn Newsom's property is plain:

A district ... may acquire by condemnation *any* land, easements, or other property inside or outside the district boundaries ... *necessary for* water, sanitary sewer, storm drainage, or *flood drainage or control purposes* or for any other of its projects or purposes, *and may elect to condemn either the fee simple title or a lesser property interest.*

TEX. WATER CODE ANN. § 49.222(a) (emphasis added); *see also id.* § 49.218(a)-(c) (Vernon Supp.2004–2005) (granting districts right to purchase land or interest in land considered necessary for districts' purposes).

Second, the majority's holding conflicts with established authority. *See Ludewig,* 773 S.W.2d at 614–15 (holding landowners' evidence that condemnor could have adopted plans circumventing landowners' property or determined size of easement differently was no evidence of arbitrary or capricious behavior where there was reasonable basis for determination); *Wagoner,* 345 S.W.2d at 763 (holding, "When the use for which property is sought under authority of the statutes of eminent domain is an authorized public use, *the necessity or expediency of condemning any particular property is not a subject of judicial cognizance* ") (emphasis added); *Meaney,* 222 S.W.2d at 408 (holding where district had statutory authority to condemn fee title, determination whether to take fee rather than easement was primarily for commissioners; in absence of showing that determination was induced by fraud or was wholly arbitrary and founded on no adequate determining principal, dis-

trict's decision was final); *Hardwicke v. City of Lubbock*, 150 S.W.3d 708, 716–17 (Tex.App.-Amarillo 2004, no pet.) (holding where there was room for two opinions as to necessity of condemning specific properties for redevelopment, action of zoning authority was not arbitrary and capricious).[1]

I believe the holding of this court improperly heightens the burden on the District in establishing the necessity of condemning property for an authorized public purpose and is contrary to the plain language of the statute the District relied on to condemn Newsom's property, section 49.222(a) of the Water Code, and to authority interpreting the condemnation power. I also believe that Newsom failed to bear his burden of proof that the District acted fraudulently, in bad faith, or arbitrarily and capriciously in condemning a portion of his property. Therefore, I respectfully dissent. I would hold that the District carried its summary judgment burden of showing the necessity of the taking for an authorized public use and that Newsom failed to raise a fact issue as to the propriety of the taking.

### Conclusion

I would reverse the district court's judgment denying the District's motion for summary judgment, reverse the judgment granting Newsom's motion for summary judgment and awarding him attorney's fees and possession of the property and improvements on it, render partial summary judgment for the District, and remand for further proceedings in accordance with this opinion.

---

1. I also disagree with the majority's conclusion that a legal condemnation agreement, such as that between the developers and the District here providing for the developers' prefunding of the costs associated with acquiring Newsom's property, presents a fact issue as to whether a condemning authority has satisfied its statutory burden of establishing public necessity. As the District points out, nothing in the administrative regulations or in the Water Code disallows prefunding agreements of the type at issue, and the Code expressly allows water districts to use their funds for reimbursement. *See* TEX. WATER CODE ANN. § 49.155(a), (c) (Vernon Supp. 2004–2005). Without evidence of fraud—and there is none here—the existence of a prefunding agreement cannot show that the condemnor acted improperly in condemning property for a public purpose. *See, e.g., Meaney*, 222 S.W.2d at 405 (courts review condemnor's decision only for fraud, bad faith, or arbitrary and capricious action).